Nos. 2015-1159, 2015-1160

# United States Court of Appeals for the Federal Circuit

SIGHTSOUND TECHNOLOGIES, LLC, *Patent Owner-Appellant,*

v.

APPLE INC., *Petitioner-Appellee.*

Appeals from the United States Patent and Trademark Office before the Patent Trial and Appeal Board in Case Nos. CBM2013-00020 (U.S. Patent No. 5,191,573) and CBM2013-00023 (U.S. Patent No. 5,966,440), Administrative Patent Judges Michael P. Tierney, Justin T. Arbes, and Georgianna W. Braden

## OPENING BRIEF OF PATENT OWNER-APPELLANT SIGHTSOUND TECHNOLOGIES, LLC

Matthew M. Wolf
*Lead Counsel*
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Jennifer A. Sklenar
Arnold & Porter LLP
777 South Figueroa Street
44th Floor
Los Angeles, California 90071
Telephone: (213) 243-4027
Facsimile: (213) 243-4199

January 13, 2015

*Counsel for Patent Owner-Appellant
SightSound Technologies, LLC*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SIGHTSOUND TECHNOLOGIES, LLC v. APPLE INC.
2015-1159, 2015-1160

## CERTIFICATE OF INTEREST

Counsel for Patent Owner-Appellant SightSound Technologies, LLC certifies the following:

1.　　The full name of every party or amicus represented by me is:
　　　　SightSound Technologies, LLC

2.　　The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
　　　　SightSound Technologies, LLC

3.　　All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
　　　　SightSound Technologies Holdings, Inc. and DMT Licensing, LLC jointly own SightSound Technologies, LLC in equal shares.  DMT Licensing, LLC is wholly owned by GE Intellectual Property Licensing, LLC, which is wholly owned by General Electric Company.

4.　　The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| Matthew M. Wolf | Jennifer Sklenar |
| David Marsh | Arnold & Porter LLP |
| Kristan Lansbery | 777 South Figueroa Street |
| Arnold & Porter LLP | 44th Floor |
| 555 Twelfth Street, NW | Los Angeles, California 90071 |
| Washington, DC 20004 | Telephone: (213) 243-4027 |
| Telephone: (202) 942-5000 | Facsimile: (213) 243-4199 |
| Facsimile: (202) 942-5999 | |

DATED:  January 13, 2015　　　　　　　*/s/ Matthew M. Wolf*
　　　　　　　　　　　　　　　　　　　　　Matthew M. Wolf

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE ...............................................................4

STATEMENT OF THE FACTS ............................................................7

    A.    Arthur Hair's Invention and the SightSound Patents...........7

        1.    The SightSound Patents ...............................................8

        2.    The Benefits of the Patented Invention.......................9

        3.    SightSound Commercialized the Patented Invention and Disclosed it to Apple.................................................11

    B.    The Patents Were Upheld Over More Than a Decade of Litigation and Re-Examination ...........................................13

    C.    CompuSonics Made Stereo Equipment Unrelated to the Patented Invention.................................................................14

    D.    The Underlying Suit and Apple's Requests for CBM Review ..........19

    E.    SightSound Objects and Responds to the Board's Actions ...............22

    F.    The Board's Final Written Decisions of Obviousness.......................25

SUMMARY OF THE ARGUMENT ...................................................26

ARGUMENT ........................................................................................27

I.    STANDARD OF REVIEW..........................................................27

II.    THE BOARD LACKED JURISDICTION TO REVIEW AND INVALIDATE THE SIGHTSOUND PATENTS.........................................28

A. The SightSound Patents Are Not "Covered Business Method Patents"......................................................................................28

B. The Board Lacked Jurisdiction to Review and Invalidate the Patents on a Ground Never Asserted by Apple....................................35

C. The Board Has Rendered Estoppel Provisions Ineffectual................40

D. The Board's Acts Prejudiced SightSound..........................................41

E. The Court Can Review The Board's *Ultra Vires* Acts ......................43

III. THE BOARD'S CONSTRUCTION OF "SECOND MEMORY" IS CONTRARY TO OVERWHELMING INTRINSIC EVIDENCE...............46

A. Intrinsic Evidence Shows That "Second Memory" Excludes Removable Media...............................................................................46

B. The Prosecution History Confirms that Second Memory Excludes Media Similar to Records, Tapes, and CDs ........................51

C. The Floppy and Optical Disks Contemplated by CompuSonics, Like Records, Tapes, and CDs, Are Not "Second Memories" ...........55

IV. THE SIGHTSOUND PATENTS ARE NOT OBVIOUS IN VIEW OF THE COMPUSONICS REFERENCES........................................................56

A. The Board Erroneously Identified a Rationale for Combining the CompuSonics References for the First Time in its Final Written Decisions................................................................................56

B. The Board Erred in Determining That Claims 1, 2, 4 and 5 of the '573 Patent and Claim 1 of the '440 Patent Were Obvious ..........59

C. The Board Erred in Determining that Claims 64 and 95 of the '440 Patent Were Obvious .................................................................65

D. The Board Overlooked Strong Indicia of Non-Obviousness..............68

CONCLUSION ...............................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alco Standard Corp. v. Tenn. Valley Auth.*,
   808 F.2d 1490 (Fed. Cir. 1986) .......................................................68

*American Bar Ass'n v. FTC*,
   430 F.3d 457 (D.C. Cir. 2005)........................................................29

*Amkor Tech., Inc. v. ITC*,
   692 F.3d 1250 (Fed. Cir. 2012) ................................................64, 66

*Apple, Inc. v. Ameranth, Inc.*,
   No. CBM2014-00013, 2014 WL 1440408 (PTAB Mar. 26, 2014) ..................35

*Armstrong v. Manzo*,
   380 U.S. 545 (1965)........................................................................42

*Arnold P'ship v. Dudas*,
   362 F.3d 1338 (Fed. Cir. 2004) ....................................................27

*Bowen v. Mich. Acad. of Family Physicians*,
   476 U.S. 667 (1986)........................................................................45

*Bragdon v. Abbott*,
   524 U.S. 624 (1998)........................................................................44

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984)........................................................................35

*Cisco Sys., Inc. v. C-Cation Techs., LLC*,
   IPR2014-00454, 2014 WL 4352301 (PTAB, Aug. 29, 2014)...........36

*City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013)..............................................................29, 34

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949)........................................................................43

*Crocs, Inc. v. ITC*,
   598 F.3d 1294 (Fed. Cir. 2010) ....................................................28

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) ........................................27

*Diversitech Corp. v. Century Steps, Inc.*,
    850 F.2d 675 (Fed. Cir. 1988) ..........................................72

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ...........................48, 50, 54

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005).........................................................33

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)............................................................36

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979).........................................................29

*Henkel Corp. v. Coral, Inc.*,
    754 F. Supp. 1280 (N.D. Ill. 1990),
    *aff'd mem.,* 945 F.2d 416 (Fed. Cir. 1991) ......................69

*In re Abbott Diabetes Care, Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012) ...........................49, 50, 51

*In re Hiniker Co.*,
    150 F.3d 1362 (Fed. Cir. 1998) ........................................44

*In re Hyon*,
    679 F.3d 1363 (Fed. Cir. 2012) ........................................58

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ..............................................43

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ........................................57

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ........................................66

*Jays Foods, LLC v. Chem. & Allied Prod. Workers Union*,
    208 F.3d 610 (7th Cir. 2000) ...........................................43

*Kingdomware Techs., Inc. v. United States*,
   754 F.3d 923 (Fed. Cir. 2014) .......................................................33

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007).................................................37, 56, 60, 61

*Leo Pharm. Prods., Ltd. v. Rea*,
   726 F.3d 1346 (Fed. Cir. 2013) .....................................................62

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) .....................................................58

*Mendenhall v. Astec Indus. Inc.*,
   13 U.S.P.Q. 2d (BNA) 1913 (E.D. Tenn. 1988),
   *aff'd mem.*, 887 F.2d 1094 (Fed. Cir. 1989) ..................................69

*Mims v. Arrow Fin. Servs., LLC*,
   132 S. Ct. 740 (2012)....................................................................32

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) .....................................................62

*Mitchell v. Beneficial Loan & Thrift Co.*,
   463 F.3d 793 (8th Cir. 2006) .........................................................30

*Moskal v. United States*,
   498 U.S. 103 (1990)................................................................34, 41

*Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008) .....................................................68

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................47, 51

*Pub. Citizen v. Nuclear Regulatory Comm'n*,
   901 F.2d 147 (D.C. Cir. 1990).......................................................30

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013) ................................................57, 59

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ..................................................48, 51

*SightSound.com, Inc. v. N2K, Inc.*,
  185 F. Supp. 2d 445 (W.D. Pa. 2002) ................................................. 14

*SightSound.com, Inc. v. N2K, Inc.*,
  391 F. Supp. 2d 321 (W.D. Pa. 2003) ................................... 14, 17, 59

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) .......................................................... 54

*Stamm v. Barclays Bank of N.Y.*,
  960 F. Supp. 724 (S.D.N.Y. 1997) ................................................... 29

*United States v. Carcione*,
  272 F.3d 1297 (11th Cir. 2001) ....................................................... 30

*United States v. Ness*,
  565 F.3d 73 (2d Cir. 2009) .............................................................. 29

*Wilson v. Dantas*,
  746 F.3d 530 (2d Cir. 2014) ............................................................ 29

## STATUTES

5 U.S.C. § 706 .................................................................................... 41

5 U.S.C. § 706(2)(C) ......................................................................... 27

18 U.S.C. § 1956(c) ........................................................................... 30

28 U.S.C. § 1291 ............................................................................... 43

28 U.S.C. § 1295(a)(4)(A) ................................................................... 2

31 U.S.C. § 5312(a)(2) ....................................................................... 30

35 U.S.C. § 101 ................................................................................... 5

35 U.S.C. § 102 ........................................................................... 21, 38

35 U.S.C. § 103 ........................................................................... 60, 66

35 U.S.C. § 103(a) ................................................................... 2, 21, 38

35 U.S.C. § 303(a) ............................................................................. 38

35 U.S.C. § 311(b) ...........................................................................28

35 U.S.C. § 315(b) ...........................................................................19

35 U.S.C. § 321(a) ...........................................................................28

35 U.S.C. §§ 321-329 .......................................................................39

35 U.S.C. § 322 .........................................................................45, 46

35 U.S.C. § 322(a) .....................................................................36, 38

35 U.S.C. § 322(a)(3) .......................................................................35

35 U.S.C. § 324 .........................................................................44, 45

35 U.S.C. § 324(a) .....................................................................36, 45

35 U.S.C. § 324(a) ...........................................................................44

35 U.S.C. § 324(b) ...........................................................................44

35 U.S.C. § 324(e) .................................................................43, 44, 45

35 U.S.C. § 325(e)(1) .......................................................................40

35 U.S.C. § 325(e)(2) .......................................................................40

35 U.S.C. § 328(a) ...........................................................................39

35 U.S.C. § 329 ..........................................................................2, 43

*Leahy-Smith America Invents Act*,
    Pub. L. No. 112-29, 125 Stat. 284 (2011) ..................................passim

**OTHER AUTHORITIES**

157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011)
    (statement of Senator Kyl)..............................................................42

157 Cong. Rec. H4497 (daily ed. June 23, 2011)
    (statement of Congressman Schuster) ..............................................33

157 Cong. Rec. S5441 (daily ed. Sept. 8, 2011)
    (statement of Senator Leahy)..........................................................33

157 Cong. Rec. S5443 (daily ed. Sept. 8, 2011)
(Statement of Senator Durbin) ................................................33

157 Cong. Rec. S5443 (daily ed. Sept. 8, 2011)
(Statement of Senator Kirk) ....................................................33

37 C.F.R. § 42.1(b) ......................................................................41

37 C.F.R. § 42.6(a)(3) ..................................................................36

37 C.F.R. § 42.204(b) ..................................................................35

37 C.F.R. § 42.204(b)(4) ..............................................................36

37 C.F.R. § 42.204(b)(5) ..............................................................36

37 C.F.R. § 42.208(a) ..................................................................36

37 C.F.R. § 42.208(c)........................................................28, 36, 38

37 C.F.R. § 42.301(a) ..................................................................34

37 C.F.R. § 42.301(b) ..................................................................35

77 Fed. Reg. 48734 (Aug. 14, 2012)............................................32

77 Fed. Reg. 48736 (Aug. 14, 2012)............................................32

*American Heritage College Dictionary* (3d ed. 1997) ............................29

*Black's Law Dictionary* (9th ed. 2009)....................................29

Federal Circuit Rule 47.5 ..............................................................1

Manual of Patent Examining Procedure § 2141.02 ...........................60, 65

## STATEMENT OF RELATED CASES

Patent Owner-Appellant's counsel is unaware of any related cases within the meaning of Federal Circuit Rule 47.5.

## JURISDICTIONAL STATEMENT

This is an appeal from two final written decisions of the Patent Trial and Appeal Board ("Board"), each dated October 7, 2014, invalidating U.S. Patent Nos. 5,191,573 (the "'573 patent") and 5,966,440 (the "'440 patent"; together, the "SightSound patents" or "SightSound's patents"), pursuant to the Transitional Program for Covered Business Method Patents created by Section 18 of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011). The Board found each patent obvious pursuant to 35 U.S.C. § 103(a) (2011). This Court has jurisdiction to determine the appeal of the Board's decisions pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

## STATEMENT OF THE ISSUES

(1)     Whether the Board erred in reviewing, and subsequently invalidating, the SightSound patents as "covered business method patents" under AIA § 18(d)(1) merely because the claims include a sales step, despite the fact that neither patent's claims relate to a "financial product or service";

(2)     Whether the Board erred in *sua sponte* reviewing, and subsequently invalidating, the SightSound patents as obvious over materials the Board called "CompuSonics publications," despite Apple's petitions having never argued such an invalidity ground and instead having argued anticipation by a non-existent "CompuSonics system";

(3)     Whether the Board erred in disregarding intrinsic evidence by which SightSound disavowed removable media such as floppy and optical disks from the meaning of "second memory";

(4)     Whether the Board erred in *sua sponte* supplying a reason to combine CompuSonics references in its obviousness review, despite Apple having never provided any such reason and the references themselves providing no such reason; and

(5)     Whether the Board erred in invalidating the SightSound patents as obvious over the "CompuSonics publications," where the stated reason to combine

the publications contravened the teachings of the materials and despite strong

secondary indicia of non-obviousness.

## STATEMENT OF THE CASE

On October 10, 2011, SightSound sued Apple for infringement of the

SightSound patents.  Complaint, *SightSound Technologies, LLC v. Apple, Inc.*, No.

2:11-cv-1292-DWA (W.D. Pa. Oct. 10, 2011), ECF No. 1.  For the next nineteen

months, the parties devoted significant resources to claim construction and fact and

expert discovery; the district court also held that Apple's defenses of laches and

estoppel failed as a matter of law.  In early 2013, Apple attempted to amend its

invalidity contentions to reference a claimed "system" for distributing music

developed by a company called CompuSonics.  The district court struck these

materials because Apple lacked good cause for not identifying them sooner.

Shortly thereafter, with expert discovery nearly complete, Apple filed four

petitions with the Board seeking covered business method ("CBM") review of the

SightSound patents under Section 18 of the AIA.  Among other grounds, Apple

asserted anticipation by the same "CompuSonics system" struck by the district

court.[1]  (*See* A00449-71, A00881-903.)[2]  Litigation was stayed over SightSound's

objection to Apple's attempted end-run of the district court's orders.

---

[1] Apple simultaneously asserted, *inter alia*, obviousness due to an invention called
Synth-Bank (A00471-89, A00903-18), improper claiming of abstract and patent-

(continued . . . )

In its preliminary responses, SightSound argued that the Board could not review the SightSound patents because such patents are not CBM patents, but rather are directed to technological inventions. While agreeing that the patented inventions as a whole had no relation to a financial services business, the Board held that it could conduct review because the claims recite steps that are "financial in nature"—namely the sale of music and video signals—and that the inclusion of such a step made the patents eligible for CBM review. (A00554-58, A00987-91.) Turning to Apple's arguments, the Board instituted review of both patents on anticipation by the so-called "CompuSonics system" posited by Apple. (A00562, A00995.) The Board then rejected the six other grounds raised by Apple, including that the patents claim abstract matter in violation of 35 U.S.C. § 101 and are obvious in light of an invention called Synth-Bank. (A00571; A01003; A01350; A01356; A01473; A01479.)

Then, departing from Apple's petitions, the Board *sua sponte* queried whether the twelve different CompuSonics-related references submitted by Apple

<hr />

( . . . continued)
ineligible subject matter (A01303-20, A01408-23), and obviousness-type double patenting (A01423-50).

[2] The CBM2013-00020 and CBM2013-00023 records contain identical entries (*e.g.*, evidentiary exhibits, deposition transcripts, *etc.*) and non-identical entries (*e.g.*, patents, briefs, declarations, *etc.*). Citations to identical entries will include only the CBM2013-00020 entry. Citations to non-identical entries will include both the CBM2013-00020 and CBM2013-00023 entries.

could be combined to render the SightSound patents obvious.  (A00570-71, A01002-03.)  The Board called this assemblage the "CompuSonics publications," a term Apple had never used.  (A00570-71, A01002-03.)  The Board acknowledged that Apple had not asserted this ground of invalidity, yet claimed "discretion" to raise this new ground on its own.  (A00570-71, A01002-03.)

SightSound objected that the Board could not take up a new and unasserted ground *sua sponte*, and that doing so was prejudicial to SightSound.  Nonetheless, SightSound's opposition papers addressed the obviousness ground raised by the Board.  On reply, Apple made obviousness arguments relating to CompuSonics for the first time.  The Board then heard oral argument, after which it ordered that SightSound was permitted to file sur-replies to address new obviousness arguments.  SightSound availed itself of this opportunity while also objecting to the unclear and shifting assertions of obviousness under consideration.  On October 7, 2014, the Board issued final written decisions in which it agreed with SightSound that no anticipatory "CompuSonics system" had existed.  (A00023-24, A00090-91.)  With this finding, the Board confirmed that none of the invalidity grounds asserted in Apple's petitions were meritorious.  The Board then rejected SightSound's objections, conducted an obviousness review over the "CompuSonics publications," and found that all pending claims were obvious.

(A00054; A00057; A00059; A00121; A00126.)  SightSound timely appealed both final written decisions.[3]

## STATEMENT OF THE FACTS

### A.     Arthur Hair's Invention and the SightSound Patents

In 1988, Arthur Hair—an inventor, Texas Instruments engineer, and later CTO of Walt Disney Studios—developed an innovative way to distribute music and movies to consumers.  Namely, Mr. Hair disclosed and patented a system for transmitting digital audio and video signals via telecommunications lines directly to consumers' computers.  By teaching storage and playback with a computer, the system rendered cassettes, CDs, and similar physical media obsolete.  Today, this technology is ubiquitous.  At the time, the concept of distributing digital content over the Internet was revolutionary.

The invention was not a pen-and-paper product or the implementation of an existing service on a computer.  Rather, Mr. Hair's specific technological advancement entails a particular hardware combination, the *sine qua non* of which is a "second memory," a single piece of non-removable hardware in the user's possession.  The "second memory" allows for permanent storage of potentially "thousands of songs" in one place, where the user can "electronically manipulate"

---

[3] On January 5, 2015, the Court granted SightSound's unopposed motion to consolidate the two appeals, and ordered that SightSound's opening brief not exceed 16,500 words.

and "easily and electronically sort stored music," thereby "eliminating the need to unnecessarily handle records, tapes, or compact disks on a regular basis." (A00294 col. 2:10-40, A00379 col. 2:14-52; A00295 col. 4:52-55, A00381 col. 5:1-4.) This invention obliterated the existing market paradigm and represented a sea change from prior distribution systems, which required consumers to maintain and manage their content in a fixed form fused to a collection of multiple, separate physical "hardware units," namely records, tapes, CDs, and the like.

1.    The SightSound Patents

On June 13, 1988, Mr. Hair filed the application that issued on March 2, 1993 as the '573 patent. The PTO subsequently issued two other patents in this family: U.S. Patent No. 5,675,734 on October 7, 1997 and the '440 patent on October 12, 1999.

Claim 1 of the '573 patent requires: (1) transferring money electronically from a second party to a first party via a telecommunications line; (2) forming a connection, through a telecommunications line, between the first party's first memory and the second party's second memory; (3) transmitting the desired digital audio signal from the first memory to the second memory via the established connection, with the second memory retained in the possession and control of the second party at a location determined by the second party; and (4) storing the transmitted signal in the second memory. (A00296 col. 6:4-24.) Dependent claim

2 adds the steps of searching for and selecting a signal from the first memory after the transferring step.  (A00296 col. 6:25-29.)  Claims 4 and 5 replicate claims 1 and 2 respectively, but pertain to digital video signals.  (A00296 col. 6:36-59.)

The '440 patent similarly teaches the electronic transfer of digital audio and video signals.  Claim 1 recites (1) forming a connection, through telecommunications lines, between a first party's first memory and a second party's second memory; (2) selling the desired digital video or digital audio signals to the second party by charging a fee through the established connection; (3) transferring the desired signals from the first memory to the second memory via the established connection, with the second memory in the possession and control of the second party; (4) storing the transferred digital signals in a non-volatile storage portion of the second memory, wherein the non-volatile storage portion is not a tape or CD; and (5) playing the stored signals.  (A00403 col. 1:33-64.) Claims 64 and 95 recite additional limitations, including, as relevant to this case, storing digital signals "in the second party hard disk."  (A00406 col. 8:37-39; A00409 col. 13:48-49.)

### 2.    The Benefits of the Patented Invention

The SightSound patents' common specification discusses disadvantages of "[t]he three basic mediums (hardware units) of music: records, tapes, and compact disks."  (A00294 col. 1:17 - col. 2:9, A00379 col. 1:24 - col. 2:21.)  The

specification discloses storing signals on "one piece of hardware, a hard disk, thus

eliminating the need to unnecessarily handle records, tapes, [] compact discs"

(A00294 col. 2:31-35, A00379 col. 2:44-48)—or any comparable hardware unit.

The invention's objective of allowing consumers to "electronically manipulate"

and "sort, cue, and select" digital signals for playback can only be achieved if the

second memory excludes removable media similar to records, tapes, and CDs, as

the specification indicates.  (A00294 col. 2:16-19, A00379 col. 2:30-33.)

Prior to this invention, the industry relied on records, tapes, and CDs as

storage media.  (A00294 col. 1:17-20, A00379 col. 1:24-26.)  Such media fused

each piece of content with its own storage medium: a consumer could not enjoy

music without physically handling—including buying, storing, and loading—a

physical storage device.  Reliance on these media created numerous inefficiencies:

limited storage capacity, sub-optimal sound quality, the potential for unauthorized

copying, and damage and deterioration of the storage units.  (A00294 col. 1:17 -

col. 2:9, A00379 col. 1:24 - col. 2:21.)  Further, sales and distribution were time-

consuming, costly, and wasteful.  (A00294 col. 1:39-49, A00379 col. 1:45-54.)

The invention solved these problems by replacing removable media with a single

piece of non-removable memory such as a hard disk and brick-and-mortar stores

with remotely-connected databases (A00294 col. 2:27-35, A00379 col. 2:40-48),

and even taught encryption to prevent unlawful copying (A00294 col. 2:51-63, A00379-80 col. 2:62 - col. 3:6).

   3.   SightSound Commercialized the Patented Invention and Disclosed it to Apple

In 1995, Mr. Hair and Scott Sander commercialized Mr. Hair's invention with a system of distributed servers, telecommunications links, and a consumer-facing website—SightSound.com—that sold digital music and videos online. (A01486-87, A05706-07.)  In 1995, SightSound's website became the first in the world to offer an interface for purchasing music via digital download over the Internet, offering a full album with album art and liner notes for $6.00, individual songs for $1.00, and free 30-second previews.  (A01487, A05707.)  In 1998, SightSound was offering individual songs on its website for $0.99 each.  (A01488, A05708; *see* A01497.)  In 1999, SightSound offered the first digital sale of a film over the Internet, and achieved another first in May of 2001 by selling a movie over the Internet to a handheld entertainment device, the Compaq iPAQ.  (A01488, A05708; A01492, A05712.)  Yet major record labels at that time refused to accept a business model that did not involve selling physical objects such as CDs and tapes, and SightSound was therefore unable to license the content needed to achieve commercial success.  (A01492, A05712.)  In 2002, with music piracy making a legitimate download business unviable, SightSound ceased selling music,

dismantled its distribution systems and focused its remaining resources on defending its patent rights.  (A01492-93, A05712-13.)

Realizing it had identified the next market for entertainment, SightSound disclosed its patents and promoted its system to potential partners, including Apple on several instances from 1993 to 2004.  (A01490-92, A05710-12.)  On April 5, 1993, Mr. Hair wrote to Apple's then-CEO John Sculley, informing Apple that his invention would "revolutionize the video rental industry and prerecorded music industry, among others, and will serve as a catalyst to propel the multimedia industry into the 21st century."  (A01486-87, A05706-07; *see* A01495.)  On January 15, 1999, SightSound wrote to Steve Jobs, disclosing a detailed schematic of its system and operations, noting that Apple would need to improve its operating system to support encryption, and even suggesting the development of a portable music player, more than two years before Apple sold its first iPod.  (A01490, A05710; *see* A01498-99.)  Shortly after the letter and schematic were sent directly to Mr. Jobs, Apple requested a meeting with SightSound.  Over the course of a two-hour meeting in February of 1999 with Apple engineer Tom Weyer and Partnership Manager of Worldwide Developer Relations Mark Gavini, SightSound disclosed virtually every facet of its operations and system.  (A01490-92, A05710-12.)  Messrs. Weyer and Gavini indicated that SightSound should not expect Apple to implement SightSound's ideas anytime soon.  (A01491-92, A05711-12.)

Yet, just a few years later, in 2003, Apple launched the iTunes Music Store ("iTMS"), which embodies and is co-extensive with the invention disclosed in the SightSound patents. iTMS uses many of the same features previously incorporated into SightSound's music download system, including an interface allowing purchases of full albums and individual songs, free 30-second previews, liner notes, and album art. (A02236, A06457-78.) Apple's expert agreed that the claims of the '440 patent cover iTMS's field of electronic sales of digital audio and video. (A02059.) While Apple has recently claimed (and the Board accepted) that iTMS was successful due to other features, Apple added many of these features *years* after the initial release and attendant commercial success of iTMS. For example, Apple touts the importance of the "Genius" feature which makes recommendations based on a user's tastes but was not added until long after the widespread adoption and commercial success of iTMS. Apple similarly provides, without reliable explanation, a laundry list of patents it claims relate to iTMS. (A00691-93, A01120-22.) But even Apple's own employee acknowledged that iTMS enjoyed immediate success upon its launch, well before it incorporated many, if not all, of these additional features. (A05607-08, A09838-39.)

## B. The Patents Were Upheld Over More Than a Decade of Litigation and Re-Examination

In 1998, SightSound sued N2K for patent infringement. That case settled in February of 2004, after SightSound obtained favorable claim constructions and

defeated N2K's motion for summary judgment of invalidity—including on the basis that the SightSound patents were obvious in view of disclosures made by a company called CompuSonics. *SightSound.com, Inc. v. N2K, Inc.*, 185 F. Supp. 2d 445 (W.D. Pa. 2002) (claim construction order); 391 F. Supp. 2d 321, 348-53 (W.D. Pa. 2003) (summary judgment order discussing and rejecting, *inter alia*, obviousness due to CompuSonics). In October of 2004, SightSound asserted its patents against Napster LLC ("Napster") and Napster's successor, Roxio. After SightSound sought a preliminary injunction, Napster requested *ex parte* reexamination and the litigation was stayed. The PTO's extensive reexamination lasted five-and-a-half years, only concluding in December of 2010. In early 2012, the parties settled and stipulated to dismissal with prejudice.

The reexamination proceedings entailed an exhaustive validity review. Over eighty U.S. Patents, three foreign patents and more than eight hundred other publications were made of record—including nine of the CompuSonics references that Apple submitted in connection with its CBM petitions. (*See* A00300-14 [56], A00388-402 [56].)

### C.    CompuSonics Made Stereo Equipment Unrelated to the Patented Invention.

The allegedly invalidating materials at issue in this appeal all relate to CompuSonics, a company that sold home stereo equipment in the 1980's called

Digital Signal Processors or DSPs.  (A01501-02, A05721-22.)  These DSPs ran on the Unix operating system and included sound editing and recording features.  (A01503-05, A05723-25.)  Apple invented the term "CompuSonics system" to describe these devices collectively, a nomenclature the Board adopted.  (*See* A00560-62, A00994-95.)  Yet the company's founder acknowledged that there was no "CompuSonics system" as such, but rather a range of products that performed, or *could theoretically* be configured to perform, different functions.  (A01542.)  Some DSPs, like many general-purpose computers at the time, could transmit data.  (A01505, A05725.)  But John Stautner, CompuSonics' second employee and lead engineer, testified that no DSP was ever used to sell digital audio or video, nor did CompuSonics create a system to sell and transmit digital files to consumers.  (A01508-09, A05728-29.)  CompuSonics went out of business in 1989 or 1990.  (A01501-02, A05721-22.)

CompuSonics' first product, the DSP-2000, allowed professionals to mix and master audio recordings.  (A01502, A05722.)  Unlike the company's consumer products, these professional-oriented devices, which began at $35,000, contained internal hard drives.  (A01502-03, A05722-23.)  At most, a few dozen were ever sold.  (A01502, A05722; 01538.)

CompuSonics' second product, the DSP-1000, was its primary focus.  To the extent there is a "CompuSonics system," it is the DSP-1000.  (A01502-03,

A05722-23.) This $7,000 device, which plugged into conventional home stereo systems with analog RCA jacks, was marketed by CompuSonics as the next generation of equipment to succeed turntables, tape decks, and CD players. (A01503-04, A05723-24.) Some devices were also sold to radio stations to replace cartridge-based playback machines. (A01503-04, A05723-24.) DSP-1000s lacked internal hard-drives; instead users had to store audio signals on a multitude of floppy disks or write-once, read-many optical disks. (A01503-04, A05723-24.)

Apple alleged the existence of a "CompuSonics system" that was "designed to facilitate transferring digital audio or video over telephone lines to a recorder/player for storage and subsequent playback," a process called "telerecording." (A05276-77, A09498-99.) As sold, however, DSP-1000s lacked the hardware and software needed to transmit data. (A01506, A05726.) Apple submitted an undated photograph of a DSP-1000 (*see* A05249), which the Board treated as a true representation of the device (*see* A00563, A00996). In fact, this image depicted nothing but an empty box: the photograph shows a non-functioning mock-up of a prototype with "no specific scripts in it" that was never sold. (A01626-27, A01629.) Moreover, "the button labeled 'telerecord' did not work and was not actually connected to anything (it was merely a nonoperational button appearing on the box used in the image)." (A01511, A05731 ; *cf.* A01512-13 (photograph of actual DSP-1000).) Thus, the notion of a system capable of

- 16 -

"telerecording" is a fiction, which the Board acknowledged in concluding that Apple failed to show anticipation.  (A00023, A00090.)

CompuSonics did suggest that, in the future, digital signals could be sent directly to consumers, and around 1986 even made a demonstration of what it called "tele-recording" via a signal transmission between two specially configured DSP-2000s controlled at either end by CompuSonics employees.  (A01505-06, A05725-26.)  This tightly choreographed demonstration employed pre-loaded software scripts to facilitate the exchange of pre-selected files, and did not involve the transfer of funds from a consumer to the owner of the recording.  (A01505-06, A05725-26; A10059; A10067-69; *see N2K*, 391 F. Supp. 2d at 350 (noting that CompuSonics' equipment "was not configured to accept credit card information and transmit it to the seller's mainframe as a preliminary step to downloading the signals").)  It is undisputed that, beyond demonstrating basic file transfers, CompuSonics never pursued the "tele-recording" concept or made any effort to create a working, consumer-facing system, and instead relegated the idea of an electronic record store to the realm of "futurama" speculation.  (A05331; *see N2K*, 391 F. Supp. 2d at 353 & n.27 (noting that CompuSonics "gave up on trying to commercialize" the idea in part because record labels "were not receptive to the concept in any way, shape, or form") (internal quotation marks omitted).)

Moreover, none of the references relating to CompuSonics' music transmission describe *consumers* storing digital signals on a single piece of non-removable memory, such as a hard disk. CompuSonics' vision of consumers storing signals in *fixed* form to a multitude of physical media emulates a system described in U.S. Patent No. 4,528,643 ("Freeny"), considered during reexamination of the SightSound patents, in which "even though the information was transmitted over a telecommunications line, the information would only be transmitted to a retail location so that a physical object, such as a CD or cassette could be made and sold on-the-spot to a customer." (A02216-18, A06437-39.)

Many materials relating to CompuSonics were considered during the '573 and '440 reexaminations. The Examiners cited five U.S. patents to David Schwartz naming CompuSonics as assignee and over eighty other references to CompuSonics and its technology and business plans. (A00300-14 [56], A00388-402 [56].) Nine of the exhibits submitted to the Board in connection with Apple's current petitions (A05191; A05197; A05198-208; A05209-10; A05211-14; A05215-45; A05246-47; A05248; A05322-24) were made of record during the previous reexaminations. (A00300-14 [56], A00388-402 [56].) In addition, SightSound submitted the *N2K* court's summary judgment opinion finding the SightSound patents non-obvious over materials relating to CompuSonics' "tele-recording" concept. (A04000-02, A10878-80; A04004-05, A10882-83.) Finally,

the Examiners used "compusonic" in prior art searches, demonstrating the PTO's awareness of CompuSonics and its finding that this technology did *not* invalidate the SightSound patents. (A04221, A11180; A04242, A11201.)

### D.    The Underlying Suit and Apple's Requests for CBM Review

On October 10, 2011, SightSound sued Apple. Nineteen months later, the parties had finished claim construction, conducted fact discovery and nearly finished expert discovery. The district court also held as a matter of law that Apple could not avail itself of the defenses of laches and estoppel. Order, *SightSound Techs., LLC v. Apple, Inc.*, No. 2:11-cv-1292-DWA (W.D. Pa. Oct. 16, 2012), ECF No. 117 (sealed order). In April of 2014, the district court struck alleged prior art relating to the so-called "CompuSonics system" due to Apple's failure to timely disclose it. Opinion and Order, *SightSound Techs., LLC v. Apple, Inc.*, No. 2:11-cv-1292-DWA (W.D. Pa. Apr. 11, 2013), ECF No. 194.

Unable to seek *inter partes* review as litigation had been pending for more than one year (*see* 35 U.S.C. § 315(b)), Apple scrambled to file four petitions for CBM review on May 6, 2013, two attacking the '573 patent and two attacking the '440 patent. Among the eight grounds asserted by Apple was anticipation of both the '573 and the '440 patent by the same "CompuSonics system." (*See* A00449-71, A00881-903.) Notwithstanding the fact that Apple's CBM petitions were filed

to circumvent the district court's orders striking the same invalidity references, at Apple's request and over SightSound's objection, further litigation was stayed.

In its preliminary responses to Apple's petitions, SightSound noted that review was unavailable because the SightSound patents are not CBM patents, but rather represent technological advancements unrelated to a financial product or service.  (A00526-43, A00958-75.)  SightSound reserved its right to respond to Apple's substantive arguments if review were instituted.  (A00504, A00931.)

On October 8, 2013, the Board instituted review.  While acknowledging that the SightSound patents "do[] not relate to a financial services business," the Board found that the claims "recite the electronic movement of money between financially distinct entities, which is an activity that is financial in nature." (A00556, A00990.).  The Board also found that the patents' claimed subject matter as a whole did not recite a technological feature.  (A00558-60, A00991-94.)  The Board rejected all grounds asserted by Apple in its petitions save one: anticipation by the so-called "CompuSonics system."  (A00562, A00995.)

However, departing from Apple's asserted grounds, the Board then posited a new invalidity theory based on twelve references from various sources relating to CompuSonics.  The Board called these the "CompuSonics publications," a term Apple had never employed in its petitions.  The Board said these "publications" were prior art and a skilled artisan "would have had reason to combine" them

because they "all describe the same system developed by CompuSonics" and "[c]ombining their disclosures would be the combination of prior art elements according to their established functions, within the skill of an ordinarily skilled artisan, and yielding predictable results." (A00570 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-18 (2007), A01002 (same).) While noting that Apple had never identified or asserted this ground, the Board claimed "discretion" to initiate and conduct this review *sua sponte*. (A00570-71 ("[I]n addition to Petitioner's asserted ground of anticipation based on the CompuSonics system under 35 U.S.C. § 102, *we exercise our discretion to institute [CBM] review* . . . on the ground of unpatentability over the CompuSonics publications under 35 U.S.C. § 103(a).") (emphasis added), A01002-03 (same).)

After review was instituted, SightSound sought leave to take discovery relating to the operation of iTMS as well as Apple's iTMS-related consumer surveys reflecting consumer preference for various features. This information was relevant to showing that iTMS practices the SightSound patents and Apple's success in operating iTMS relates to the patented technology itself, and not another factor. However, the Board denied all efforts by SightSound to take discovery of Apple. (*See* A00689-94, A01118-23.)

### E.   SightSound Objects and Responds to the Board's Actions

On January 3, 2014, SightSound submitted its responses.  As to anticipation, SightSound submitted the testimony of CompuSonics' lead engineer John Stautner to show that no single "CompuSonics system" had ever existed, and that CompuSonics had never created a system for transmitting digital audio and video signals to consumers.  (A00591-93, A01023-25; A01505-11, A05725-31; A01542.)  Moreover, the DSP-1000 only stored music on a multitude of removable floppy and optical disks, meaning it did not use the single "second memory" that is critical to the SightSound patents.

SightSound then noted that the Board lacked jurisdiction to *sua sponte* conduct an obviousness review on a ground never asserted by Apple.  (A00641-44 (citing 37 C.F.R. § 42.208(c)), A01071-74 (same).)  The Board's extra-jurisdictional act injected an entirely new theory into the proceedings, requiring SightSound to address unstated combinations of prior art as well as arguments of which it had no notice.  Nonetheless, SightSound demonstrated that even if one adopted the Board's view of the "CompuSonics publications," these references neither disclosed the elements of the SightSound patents nor provided a reason to combine the references to yield the patented invention.  (A00644-51, A01074-81.)  SightSound also submitted significant evidence of secondary considerations of

non-obviousness, notwithstanding the Board's denial of SightSound's attempted
discovery of Apple.  (A00651-65, A01081-95.)

On March 21, 2014, almost a year after submitting its petitions for review,
Apple submitted replies that, for the first time, offered obviousness arguments
relating to CompuSonics.  Apple dedicated just three paragraphs to its prima facie
case.  (A00687-89, A01116-18.)  Apple failed to identify any particular
combination of references that allegedly rendered the SightSound patents obvious,
nor a reason to combine separate references in a particular manner.  (A00687-89,
A01116-18.)  Rather, Apple's obviousness reply largely attacked *SightSound's*
arguments, as well as SightSound's proffer of secondary considerations.  (A00687-
94, A01116-23.)  Moreover, Apple submitted evidence it had never cited or
submitted with its opening petitions on topics for which SightSound was denied
discovery, including dozens of patents, numerous articles and five new fact and
expert opinions allegedly relating to the operation of iTMS—in total, at least one
hundred and eleven new exhibits.  (A00671-78 (disclosing Exs. 4157-4269),
A01101-07 (disclosing Exs. 4358-4468).)

SightSound objected to Apple's injection of significant amounts of new
arguments and evidence on reply and sought leave to strike them, which requests
the Board denied.  (A00697-98, A01126-27.)  In setting oral argument, the Board
reminded the parties that their arguments and exhibits were limited to those raised

during briefing.  (A00705-06 (citing *CBS Interactive Inc. v. Helferich Patent Licensing, LLC*, IPR2013-00033, Paper 118 (Oct. 23, 2013)), A01134-35 (same).)

Trial was held on May 6, 2014.  At trial, Apple echoed a suggestion made by a panel member that a hard disk would have been an obvious "design choice" for a second memory on a DSP—an argument Apple had *never* previously made.  (A00793, A00808.)  Two weeks later, the Board issued an order noting SightSound's position "that it did not have a fair opportunity to respond to the obviousness ground because Petitioner did not assert the ground in its petitions and argued the issue for the first time in its replies, to which Patent Owner was not able to respond."  (A00709-10, A01138-39.)  The Board did not dispute that this was the case.  Instead, the Board ordered that in light of "the particular factual circumstances of these cases," SightSound could submit sur-replies to address Apple's newly-raised assertions.  (A00709, A01138.)

SightSound did so, yet noted that Apple had still "proposed no combination of References that collectively teaches the claimed invention" nor given any "reason why a person of ordinary skill would combine disclosures for disparate systems (and 'futurama' speculation) to obtain the claimed invention."  (A00818, A01247.)  Consequently, the mere opportunity to submit sur-replies did not ameliorate the prejudice of having to respond to shifting grounds of invalidity that were never made in Apple's petition, but rather were proposed by the panel at

argument, and rested on materials SightSound had been deprived of the
opportunity to challenge via discovery.

### F.    The Board's Final Written Decisions of Obviousness

On October 7, 2014, the Board issued final written decisions.  On
anticipation, the Board agreed with SightSound, holding that the notion of a single
"CompuSonics system" capable of practicing the patented invention was a fiction.
(A00023-24 ("Although the materials contain very similar disclosures, we are not
persuaded that they disclose a single, publicly known system that anticipates the
challenged claims."), A00090-91(same).)  With this finding, the Board had
determined that none of the eight grounds stated in Apple's four petitions
invalidated the SightSound patents.

The Board then turned to obviousness.  On SightSound's jurisdictional
objections, the Board did not dispute that Apple's petitions never *asserted*
obviousness over CompuSonics.  Instead the Board claimed that the petitions
"*supported* a ground of obviousness based on the CompuSonics publications."
(A00026 (emphasis added), A00093 (same).)  The Board found all claims obvious
on that basis, yet chiefly cited Apple's anticipation arguments.  (A00031-42,
A00098-110.)  Moreover, the Board pieced together combinations of references
that were never asserted in Apple's petitions; rather, the Board supplied a reason to

combine these references based only on the contents of the references themselves. (A00040, A00107.)

Addressing secondary considerations, the Board credited all assertions made by Apple about iTMS on reply—despite depriving SightSound discovery on this issue—and rejected SightSound's proffer wholesale. (A00042-54, A00110-121.) SightSound timely appealed.

## SUMMARY OF THE ARGUMENT

In striving to invalidate the SightSound patents, the Board twice exceeded its statutory jurisdiction. First, the Board disregarded the fact that the SightSound patents are not CBM patents, but instead claim a technological invention that has no relevance whatsoever to a "financial product or service." Second, the Board disregarded the due process requirements of CBM review in *sua sponte* reviewing (and subsequently invalidating) the SightSound patents on a ground never asserted by Apple. These *ultra vires* acts were prejudicial, can be reviewed by this Court, and should be vacated without regard to the Board's remaining findings.

If this Court does review the Board's obviousness findings, it should first hold that the Board erred in construing "second memory" to include removable memory such as a record, tape, CD, or floppy disk. The specification and probing reexamination history repeatedly and conclusively show the term is limited to a

single, non-removable storage medium, such as a hard drive, and excludes a collection of records, tapes, CDs and similar media.

The Court should also hold that the Board erred in finding the SightSound patents obvious in light of the "CompuSonics publications." The Board first inverted the burden of proof by raising this ground *sua sponte*, requiring SightSound to respond to arguments never asserted by Apple. The Board then denied SightSound the ability to challenge this evidence via discovery and failed to credit SightSound's own evidence of non-obviousness. Finally, the Board invented various combinations of a dozen disparate CompuSonics references despite no party—and certainly not Apple—having shown how and why a person of skill in the art would combine these references to yield the precise inventions disclosed in the SightSound patents. In sum, the Board used a deeply flawed process to reach an untenable conclusion. This Court should reverse and vacate the Board's findings.

## ARGUMENT

## I.     STANDARD OF REVIEW

This Court examines *de novo* whether the Board acted "in excess of statutory jurisdiction [or] authority." *See* 5 U.S.C. § 706(2)(C); *see Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004). This Court also reviews claim constructions *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456

(Fed. Cir. 1998). Whether a patent is obvious is a question of law reviewed *de novo*, while underlying factual findings are reviewed for substantial evidence. *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1308 (Fed. Cir. 2010).

## II. THE BOARD LACKED JURISDICTION TO REVIEW AND INVALIDATE THE SIGHTSOUND PATENTS

This Court should reverse the Board's extra-jurisdictional acts of reviewing and invalidating SightSound's non-CBM patents on grounds never asserted by Apple.

### A. The SightSound Patents Are Not "Covered Business Method Patents"

This appeal raises an issue not yet decided by an Article III tribunal: whether inventions having no connection to a "financial product or service" may qualify as CBM patents solely because they include a sales step. While Congress specified that CBM review would "employ the standards and procedures of, a post-grant review" (AIA § 18(a)(1)), it only permitted review of patents claiming "a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service." *Id.* § 18(d)(1). The Board also may not review "technological inventions."[4] *Id.* Because this appeal turns on the statutory meaning of "financial product or

---

[4] Congress placed no such limitations on *inter partes* review or post-grant review. *See* 35 U.S.C. §§ 311(b), 321(a).

- 28 -

service," the Court focuses on "the language of the statute itself." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210 (1979). The Court's role is to implement the text's plain meaning, applying canons of construction where necessary. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).

"Financial" means "[o]f or relating to, or involving finance," while "finance" is the "science of the management of money and other assets" such as "banking, investments, and credit." *Am. Heritage College Dictionary* 510 (3d ed. 1997); *see also Black's Law Dictionary* 707 (9th ed. 2009) (providing similar definitions). Courts construe "financial" in this narrow manner unless Congress provides a contrary definition—which it did not here. *See, e.g.*, *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) ("international or foreign financial operations" are "foreign operations that consist of '[t]he act or process of raising or providing funds,' including '[t]he raising of funds by issuing capital securities (shares in the business)'") (citing *Black's Law Dictionary*); *American Bar Ass'n v. FTC*, 430 F.3d 457, 467 (D.C. Cir. 2005) (law allowing FTC to regulate "financial institutions" excluded law firms, as Congress does not "hide elephants in mouseholes") (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).[5]

---

[5] *See also Stamm v. Barclays Bank of N.Y.*, 960 F. Supp. 724, 728 (S.D.N.Y. 1997) ("financial operations" covers operations that provide "capital or loan money as needed to carry on business") (internal quotation marks omitted); *United States v. Ness*, 565 F.3d 73, 79 (2d Cir. 2009) (armored car company not a "financial

(continued . . . )

Consequently, to relate to a "financial product or service," the invention as a whole must be directed to the management of money, banking, investment or credit. *See Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 155 (D.C. Cir. 1990) (construing the word "requirements" in one statute in part by considering its meaning in other statutes). The narrow and precise language of the statute shows that Congress did not intend to permit the Board to conduct CBM review of *any* patent whose limitations incidentally involve commerce, money, or a sale. Had Congress intended to sweep more broadly and cover any financial *transaction*, it was perfectly capable of saying so. *See United States v. Carcione*, 272 F.3d 1297, 1302-03 (11th Cir. 2001) (holding that transferring funds met the "financial transaction" requirement of 18 U.S.C. § 1956(c)).

The SightSound patents are not CBM patents. The patents teach a multi-step, technological process for transmitting and storing digital music and video. The key component of this process is the digital transmission to, and storage in, a single, non-removable second memory, rendering obsolete not just music stores, but also super-floppy disks and stereo equipment of the kind unsuccessfully

---

( . . . continued)

institution" under 31 U.S.C. § 5312(a)(2) and regulations covering a "money services business"); *Mitchell v. Beneficial Loan & Thrift Co.*, 463 F.3d 793, 795-96 (8th Cir. 2006) ("finance charge" is a charge imposed "as an incident to the extension of credit" and excludes telephone bills).

marketed by CompuSonics. (*E.g.*, A00296 col. 6:4-24, A00403 col. 1:33-64.) Electonic transmission and strorage of songs and movies has nothing to do with the administration or management of financial assets, banking, investment, or credit (nor do any of the allegedly invalidating CompuSonics references).

Ignoring both the limitations of AIA Section 18 and the subject matter of the SightSound patents, the Board seized upon a single claim limitation—"transferring money electronically"—and reasoned that the inclusion of such a step meant that the '573 patent was "directed to activities that are *financial in nature*, namely the sale of digital audio." (A00554 (emphasis added).)[6] The Board determined that the single step of paying for something can be characterized as a "financial activity," and concluded that, even though it is only one step of a technological method, "allowing such a transfer amounts to providing a financial service." (A0055455.) This flawed syllogism conflates any sale of a *non-financial* product with an invention that is itself directed to providing a financial product or service.

The Board's holding is indefensible under the statutory text. Congress assuredly did *not* allow CBM review of any invention that employs a single

---

[6] All claims of the '573 patent recite "transferring money electronically," while the '440 patent employs similar limitations: "selling electronically" (A00403 col. 1:40, 44; A00406 col. 8:22, 26) and "charging a fee" (A00403 col. 1:44-45, 48; A00406 col. 8:26-27, 30; A00409 col. 13:24, 29-30, 33) to which the Board applied identical reasoning. (*See* A00987-91.)

element that is "financial in nature" or makes a fleeting reference to "financial activity." AIA Section 18 also does not state that any and every patent that entails a sale or exchange is eligible for CBM review. Rather, the statute limits review to patents fulfilling carefully defined attributes: those "used in the practice, administration, or management of a financial product or service."

In defense of its expansive gloss, the Board echoed Senator Schumer's aspirational statement that Section 18 "was drafted to encompass patents 'claiming activities that are financial in nature, incidental to a financial activity or complementary to a financial activity.'" (A00554 (citing 157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer)); *see also* 77 Fed. Reg. 48734, 48736 (Aug. 14, 2012) (reasoning that Senator Schumer's statement supports the "notion that 'financial product or service' should be interpreted broadly").) That one legislator prefers a broader reading than the statute allows is without moment. Because the statute is unambiguous, a stray floor statement cannot dictate an extra-statutory interpretation. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 752 (2012) (noting that "the views of a single legislator, even a bill's sponsor, are not controlling").

Moreover, several statements in the AIA's legislative history espouse a *narrow* reading of "financial."[7]  The Board has not explained why Senator Schumer's views should trump these statements.  The Board's flawed exegesis does not reflect reasoned analysis but rather post-hoc justification, illustrating the maxim that seeking out an isolated snippet of legislative history to support a desired reading is like "looking over a crowd and picking out your friends."  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (citations omitted) (internal quotation marks omitted).

This Court owes no deference to such agency misinterpretation.  *See Kingdomware Techs., Inc. v. United States*, 754 F.3d 923, 930 (Fed. Cir. 2014) (where "Congress has spoken to the precise question at issue . . . the

---

[7] While such statements are similarly irrelevant in light of the unambiguous statutory text, the Court is respectfully directed, for example, to remarks by Senators Leahy, Kirk, and Durbin, as well as Representative Shuster.  *See* 157 Cong. Rec. S5441 (daily ed. Sept. 8, 2011) (Statement of Sen. Leahy) (noting that Section 18(d)(1) covers activities in the financial industry such as "insurance, brokerages, mutual funds, annuities," *etc.*); *id.* S5433 (Statement of Sen. Kirk) ("I vote for this legislation with the understanding that Section 18 . . . is not too broadly interpreted"); *id.* (Statement of Sen. Durbin) ("I cast this vote after receiving assurances from my colleagues that the scope and application of Section 18 would be appropriately constrained . . . ."); 157 Cong. Rec. H4497 (daily ed. June 23, 2011) (Statement of Rep. Shuster) (stating that Section 18 "target[s] only those business method patents that are unique to the financial services industry in the sense that they are patents which only a financial services provider would use to furnish a financial product or service," *e.g.,* "a patent relating to electronic check scanning").

unambiguously expressed intent of Congress prevails") (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984) (internal quotation marks omitted)).  Moreover, the PTO's own regulations incorporate the narrow statutory definition of Section 18(d)(1).  *See* 37 C.F.R. § 42.301(a).  Even if the PTO had attempted to expand the scope of CBM review via administrative fiat, this too would be void as the limited rule-making authority conferred by Congress does not allow the Board to alter the basic statutory definition of "covered business method patent."  *Cf.* AIA § 18(a)(1) (the Director shall "issue regulations establishing [CBM review]"); *id.* § 18(d)(2) (the Director shall "issue regulations for determining whether a patent is for a technological invention").  The Board's extra-statutory land-grab is therefore void.  *See City of Arlington*, 133 S. Ct. at 1868 ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.").

In arrogating power to review any patent that it deems "financial in nature," the Board improperly rendered superfluous the key "financial product or service" requirement of AIA Section 18(d)(1).  *Cf. Moskal v. Unites States*, 498 U.S. 103, 109 (1990) ("[A] court should give effect, if possible, to every clause and word of a statute.") (citations omitted) (internal quotation marks omitted).  As this case shows, by characterizing any commerce-related invention as subject to CBM

review, the Board is reviewing patents that have nothing to do with finance.[8]  In

cases such as this, the unambiguous statute is "the end of the matter."  *See*

*Chevron*, 467 U.S. at 842.[9]  The Board's decisions should be vacated.

### B.    The Board Lacked Jurisdiction to Review and Invalidate the Patents on a Ground Never Asserted by Apple

The Board's invalidity findings should also be vacated because they rest on

grounds that Apple never asserted.

Because a patentee may lose valuable property rights through CBM review,

Congress provided numerous procedural safeguards, several of which the Board

ignored below.  First, a petition must recite, "in writing and with particularity," all

challenged claims, the grounds for each challenge, and all supporting evidence and

opinions.  35 U.S.C. § 322(a)(3); *see also* 37 C.F.R. § 42.204(b) (petition must

state "the precise relief requested for each claim challenged" by identifying

---

[8] This case is not the only instance where the Board has overreached to review patents lacking even the faintest connection to finance.  When you buy a Big Mac, McDonald's does not give you a "financial product or service."  It would seem that the Board disagrees.  *See, e.g.*, *Apple, Inc. v. Ameranth, Inc.*, No. CBM2014-00013, 2014 WL 1440408, at *7 (PTAB Mar. 26, 2014) (holding that a "a method of using a computer system to create and communicate a menu" including "a 'pay' tab for paying for the ordered items" is "incidental or complementary to a financial activity, namely sales of food or drinks").

[9] The patents are also not CBM patents because they recite novel and unobvious technological features: the patents recite a computer to transmit, and a second memory to store, digital signals in a way that prior art hardware units did not.  *See* AIA § 18(d)(1); 37 C.F.R. § 42.301(b).

(1) "the claim" and (2) the "specific statutory grounds" applicable to each claim).
Second, the information "in the petition," if unrebutted, must show why any claims
are unpatentable.  35 U.S.C. § 324(a); *see also* 37 C.F.R. § 42.204(b)(4)-(5)
(petition must connect the "statutory grounds" to "specific portions of the evidence
that support the challenge").  Third, the Board may only conduct review on
"grounds of unpatentability *asserted* for each claim," and "shall not" institute
review on grounds unsupported by a petition.  37 C.F.R. § 42.208(a), (c) (emphasis
added).  Consequently, all relevant arguments must be contained *in the petition*.
*See* 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference
from one document into another document."); *Cisco Sys., Inc. v. C-Cation Techs.,
LLC*, IPR2014-00454, 2014 WL 4352301 (PTAB, Aug. 29, 2014) (denying
petition for review due to attempt to incorporate expert declaration by reference).

There can be no dispute that ***Apple's petitions never argued obviousness
over CompuSonics***.  Apple certainly never made such an argument "with
particularity," and identified no evidence in support of such a ground.  *Cf.* 35
U.S.C. § 322(a).  Apple *never* discussed CompuSonics in light of the standard set
by *Graham v. John Deere Co.*, 383 U.S. 1 (1966), it *never* identified a combination
of CompuSonics materials that collectively taught the invention of the SightSound
patents, and it *never* provided a reason to combine those materials—with

themselves or any other reference—as required by *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).  The issue was simply not fair game.

In raising obviousness over CompuSonics and bridging the gaps noted above, the Board became both judge and advocate in direct contravention of Congress's narrow grant of statutory authority.  On its own, the Board determined that twelve CompuSonics-related submissions were all prior art and that all limitations of the SightSound patents could be found within these "CompuSonics publications" (a term the Board coined).  (A00570-71, A01002-03.)  The Board then posited that one would combine these disparate references—Billboard Magazine articles, shareholder letters, promotional materials, slides from presentations, and a vaporware photograph of a non-functional DSP-1000 mock-up—because such "publications all describe the same system developed by CompuSonics" (a premise that the Board later recognized lacked any basis in fact).  (A00570, A01002.)  The Board pointed to no reason that such a mélange would yield the particular inventions disclosed in the SightSound patents, as opposed to some other combination, but instead incanted the bare conclusion that "[c]ombining their disclosures would be the combination of prior art elements according to their established functions, within the skill of an ordinarily skilled artisan, and yielding predictable results."  (A00570 (citing *KSR*, 550 U.S. at 416-18), A01002 (same).).

- 37 -

The Board conceded in instituting review that Apple's petitions put forward *none* of the foregoing.[10]  Indeed, in a moment of frankness from which it backtracked in its final written decisions, the Board claimed inherent power to raise this new ground of review: "*[I]n addition to Petitioner's asserted ground* of anticipation based on the CompuSonics system under 35 U.S.C. § 102, *we exercise our discretion* to institute [CBM] review . . . on the ground of unpatentability over the CompuSonics publications under 35 U.S.C. § 103(a)." (A00571 (emphasis added), A01002-03 (same).)

Far from granting plenary "discretion" to raise new invalidity analyses from whole cloth, the governing statute and regulations proscribe review on grounds not made *in a petition* and articulated *with particularity*.  35 U.S.C. § 322(a); 37 C.F.R. § 42.208(c).[11]  Alerted to its errors by SightSound's vociferous objections, the Board's final written decisions omitted any pretense of "discretion" to go beyond

---

[10] Apple's expert made a conclusory, catch-all claim that the SightSound patents were obvious based on unspecified combinations of art. (A05287 ("A number of prior art references, including those discussed above, show that the various claim elements of the '573 patent were well known both individually and in combination in the prior art . . . ."), A09508 (similar claim for the '440 patent).  This nebulous statement is insufficient to put SightSound on notice of any specific argument.  Moreover, because it was not in Apple's petitions, it carries no weight.

[11] For example, Congress has never given the Board authority akin to the ability to *sua sponte* identify new questions of patentability allowed in *ex parte* reexaminations.  *Cf.* 35 U.S.C. § 303(a) ("On his own initiative, and any time, the Director may determine whether a substantial new question of patentability is raised by patents and publications discovered by him").

the petitions, and instead submitted two ineffectual justifications.  *First*, the Board offered the fig leaf that despite arguing something else entirely, "Apple's Petition supported a ground of obviousness based on the CompuSonics publications." (*See* A00026, A00093.)  In so doing, the Board not only ignored the statutory requirement that all grounds of invalidity be stated, but engaged in sleight-of-hand by citing Apple's anticipation arguments, which did not address obviousness and never used the phrase "CompuSonics publications." (Apple's petitions instead relied on the inconsistent—and factually incorrect—premise of a unitary "CompuSonics system," a "system" which the Board determined did not exist.)

*Second*, the Board stated that upon instituting review, its mandate is to "issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner." (A00026-27 (citing 35 U.S.C. § 328(a)), A00093-94 (same).)  Under this sweeping interpretation, the Board *must* review a patent on *any* conceivable ground it identifies, regardless of what a petition argues.  No statute or rule permits a petitioner to submit reams of art and delegate to the Board the bothersome task of constructing a theory of invalidity that best fits the facts. Rather, for a valid decision to issue, review must have been initiated "under this chapter." *See* 35 U.S.C. § 328(a).  A process that ignores and violates Section 322 cannot have been validly initiated "under" the relevant chapter.  *See* 35 U.S.C. §§ 321-329.

### C.    The Board Has Rendered Estoppel Provisions Ineffectual

As proof that the Board erred in expanding its own powers, the Court need only examine how the Board has nullified the governing estoppel rules. Congress precludes second petitions for CBM review on grounds that *could have been raised* in an earlier petition, while precluding litigation only on those grounds *actually raised* in a CBM petition and that lead to a final written decision. AIA § 18(a)(1)(D); *see also* 35 U.S.C. § 325(e)(1)-(2). Review unmoored from the grounds actually asserted destroys this balance. If the Board had found the SightSound patents nonobvious, Apple could later attempt to relitigate the issue because it was the Board that first raised it—thereby frustrating the statutory purpose.

The Board's actions remain improper even if the Court indulges the fiction that the Board didn't raise obviousness, but rather, Apple's petitions did. If a party can raise obviousness by asserting anticipation, then non-anticipation findings will preclude all subsequent challenges based on obviousness, or any other ground supported by similar art. This too nullifies the statutory distinction between what a party *actually* raised versus what it *could have* raised. Whichever version the Court believes—that the Board raised obviousness *sua sponte*, or that Apple's petitions did so unwittingly—the Board's actions here render the estoppel rules a

dead letter, proving that they are inimical to the scheme crafted by Congress. *See*

*Moskal*, 498 U.S. at 109.

### D.    The Board's Acts Prejudiced SightSound

Because the Board's errors led it to invalidate SightSound's patents, the

prejudice to SightSound is manifest. *See* 5 U.S.C. § 706. Moreover, in advocating

a new theory of invalidity on Apple's behalf, the Board subverted the statutory

scheme and created an unfair process. *Cf.* 37 C.F.R. § 42.1(b) ("This part shall be

construed to secure the just, speedy, and inexpensive resolution of every

proceeding."). In this compressed adversarial proceeding administered by non-

Article III officials, patentees are afforded only a preliminary response and a single

substantive opposition, yet must defend against a broad claim construction

standard without the presumption of validity that attaches in federal court. And as

this case shows, discovery is not a realistic prospect.[12] Given the headwinds faced

by patentees, the Board must adhere to its statutory role and refrain from adding

grounds it deems superior to those actually asserted.[13]

---

[12] The Board denied SightSound's efforts to take discovery concerning the operation and commercial success of iTMS, yet credited all evidence on the same topic submitted with Apple's replies. (A00689-94, A01118-23.) When SightSound objected and moved to strike the untimely arguments and evidence, the Board summarily denied SightSound's motions. (A00697-98, A01126-27.)

[13] Again, while the legislative history does not control, it reflects Congress's decision not to give the Board *carte blanche* to independently seek out grounds of

(continued . . . )

Here, in its response, SightSound faced a Kafkaesque scenario of having to preemptively refute obviousness arguments never articulated in Apple's petitions. On reply, Apple did not identify a combination of references to show obviousness, and instead mainly attacked SightSound's arguments. Then, at oral argument, Apple eagerly adopted another suggestion provided by the Board in the form of a question from the panel: that reconfiguring a DSP-1000 to include non-removable second memory would entail a mere "design choice." (A00793, A00808.)

Following oral argument, the Board *sua sponte* allowed SightSound to submit sur-replies to address new arguments. SightSound used the opportunity to emphasize the unfairness of having to guess at shifting and still-uncertain arguments and combinations of art. (*See* A00817-19, A01246-48.) The procedural white-wash offered by the sur-reply didn't change the fact that SightSound was arguing against a review that *presumed* its patents obvious and improperly placed the burden on *SightSound* to prove the contrary. *See Armstrong v. Manzo*, 380 U.S. 545 (1965) (holding that an adverse decree entered without adequate notice to a party must be vacated; an opportunity to merely argue that the decree should be

_____

( . . . continued)

invalidity. 157 Cong. Rec. S1376 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) (noting that, "by requiring petitioners to tie their challenges to particular validity arguments against particular claims, the new threshold will prevent challenges from 'mushrooming' after the review is instituted into additional arguments employing other prior art or attacking other claims").

set aside does not comport with due process requirements).  Due process requires

more than the opportunity to offer a final, unheeded objection to the fairness of the

proceeding.

### E.    The Court Can Review The Board's *Ultra Vires* Acts

SightSound anticipates that the PTO will intervene, as it has in other

appeals, to assert that under 35 U.S.C. § 324(e), this Court is powerless to correct

the Board's extra-jurisdictional acts and due process violations.  This argument

rests on a flawed statutory interpretation.

Any party dissatisfied with a "final written decision" of the Board may

appeal the decision.  35 U.S.C. § 329.  Decades ago, the Supreme Court construed

similar language in 28 U.S.C. § 1291, which likewise allows appeals from "final

decisions," to permit review of any non-moot interlocutory order "merged" into a

final decision.  *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-46

(1949) (holding that the purpose of the "final decision" requirement is to "combine

in one review all stages of the proceeding that effectively may be reviewed and

corrected if and when final judgment results").[14]  The Court should find that

---

[14] *See also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 706 (3d Cir. 1996) ("Under
the 'merger rule,' prior interlocutory orders merge with the final judgment in a
case, and the interlocutory orders (to the extent that they affect the final judgment)
may be reviewed on appeal from the final order."); *Jays Foods, LLC v. Chem. &
Allied Prod. Workers Union*, 208 F.3d 610, 614 (7th Cir. 2000) (merger rule allows

(continued . . . )

Congress's use of near-identical language in Section 329(a) incorporates the

"merger rule" and authorizes parties to appeal all non-moot issues raised in the

course of a proceeding in a single appeal.  *See Bragdon v. Abbott*, 524 U.S. 624,

645 (1998) ("When administrative and judicial interpretations have settled the

meaning of an existing statutory provision, repetition of the same language in a

new statute indicates, as a general matter, the intent to incorporate its

administrative and judicial interpretations as well.").

Only a single category of decision is non-reviewable: threshold findings

"under" Section 324 that a claim is "more likely than not" unpatentable or that a

petition "raises a novel or unsettled legal question that is important to other patents

or patent applications."  35 U.S.C. § 324(a)-(b), (e).  This ensures that this Court is

not burdened with reviewing initiation decisions that are "washed clean" and

mooted by final merits-based decisions.  *See In re Hiniker Co.*, 150 F.3d 1362,

1366-67 (Fed. Cir. 1998).  With Section 324(e), Congress also disallowed appeals

from final decisions denying review, thereby precluding meritless challenges based

upon petitions that neither show *prima facie* invalidity nor raise an important legal

---

( . . . continued)
a party to "bring a single appeal from the judgment and challenge all nonmoot
interlocutory orders, appealable or not, rendered along the way").

question.  Section 324(e) does not affect appellate review of any other

determinations.

    With this appeal, SightSound is not appealing a decision made under Section

324.  Rather, SightSound challenges decisions under two entirely different statutes:

the Board's overbroad construction of what constitutes a CBM patent under AIA

Section 18 and the Board's failure to abide by the requirements of Section 322.

*See supra* Parts II.A-B.  The fact that these errors first surfaced in the same order

that contains the Board's finding under Section 324(a) does not render the former

decisions categorically non-appealable.  The Board's errors infected the entire

proceeding with error and were merged into the Board's final written decisions.

    In other appeals, the PTO has asked this Court to ignore the limited scope of

Section 324(e) and claimed that this Court can review *nothing* other than the merits

of patentability in a final written decision by the Board.  Were the Court to agree, it

would allow a narrow exception to swallow the long-standing merger rule.  If

Congress really had wished to create an administrative star chamber acting as

prosecutor, judge, and executioner, with almost no recourse for jurisdictional or

due process errors, it would have said so explicitly.  *See Bowen v. Mich. Acad. of

Family Physicians*, 476 U.S. 667, 670-71 (1986) (noting the "strong presumption

that Congress intends judicial review of administrative action").  Congress

manifestly did *not* shield from review the *ultra vires* application of AIA Section 18

nor the Board's failure to proceed as mandated by Section 322.  The Board's

decisions should be vacated, and the Court need not review the remaining issues in

this appeal.

## III.    THE BOARD'S CONSTRUCTION OF "SECOND MEMORY" IS CONTRARY TO OVERWHELMING INTRINSIC EVIDENCE

Should the Court proceed to consider the Board's patentability findings, it

will see that they suffer from numerous deficiencies, many rooted in the flawed

process employed by the Board.  First, in construing the scope of "second

memory," the Board ignored intrinsic evidence excluding removable media similar

to records, tapes, and CDs.  The Board instead relied upon extrinsic dictionary

definitions—which it sought out and cited for the first time in its final decisions—

to define the term as any "second storage space in a computer system or medium

that is capable of retaining data or instructions."  (A00009-15, A00078-82.)  As a

result, the purported second memory of a CompuSonics DSP-1000—floppy and

optical disks—was wrongly deemed to fulfill the purpose of the SightSound

patents, despite these devices sharing the disadvantages of the disparaged records,

tapes, and CDs.

### A.    Intrinsic Evidence Shows That "Second Memory" Excludes Removable Media

Claim terms "are generally given their ordinary and customary meaning,"

but must be construed in context—including the language of the claims, the entire

specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005). While the claims define the scope of the invention, the claims "do not stand alone" and "must be read in view of the specification of which they are a part." *Id*. at 1315 (quotation omitted). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In that regard, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313.

As the SightSound patents' specification makes clear, a removable "second memory" cannot fulfill the purpose of the invention to overcome the disadvantages of the then "three basic mediums (hardware units) of music: records, tapes, and compact disks" (A00294 col. 1:17-20, A00379 col. 1:24-26) and similar "hardware units" that restricted the distribution of music and resulted in inefficiencies inherent in their *removable nature*. (*See* A00294 col. 1:24-27 (units "are subject to damage and deterioration during normal operations, handling, and exposure to the elements"), A00379 col. 1:30-33 (same); A00294 col. 1:28-31 (physical size of CDs, *etc*. "imposes constraints on the quantity of hardware units which can be housed for playback in confined areas"), A00379 col. 1:34-37

(same); A00294 col. 1:39-49 (hardware units "need to be physically transferred," creating "lag time" and "incurring unnecessary and inefficient transfer and handling costs" as well as "the material cost of the hardware units themselves"), A00379 col. 1:45-54 (same).)  This is not "[m]ere criticism of a particular embodiment" (*see* A00012 (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012)), A00081 (same)), as any removable medium with the same disparaged attributes *cannot be* an embodiment of SightSound's invention—not even a less-preferred one.  (*See* A02190-96, A06412-17.)

A single, non-removable "hard disk" is the only "second memory" disclosed in the embodiment.  (A00292-93, A00377-78; A00294 col. 2:27-35, A00379 col. 2:40-48; A00295 col. 3:44 - A00296 col. 6:2, A00380 col. 3:57 - A00382 col. 8:42.)  A term's meaning must be limited where, as here, "the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention."  *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (citation and internal quotation marks omitted).  Because a hard disk is included in *every disclosed embodiment*, non-removable memory is not merely an element of an embodiment, but is crucial to effectuating the avowed purpose of the invention, and therefore reflects a disclaiming of dissimilar technologies.  (*See* A00610-12, A01043-46; *Saffran v. Johnson &*

*Johnson*, 712 F.3d 549, 559-60 (Fed. Cir. 2013) ("Extensive, consistent usage in the specification therefore suggests that the claimed 'device' should be understood as a sheet, which, rather than confining the term to a single embodiment, would accord with *every* embodiment and description presented in the '760 patent, not to mention the prosecution history.") (emphasis in original).)

SightSound cited several cases to the Board demonstrating that the specification controls claim construction in circumstances such as these, including *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148-50 (Fed. Cir. 2012), which found the specification to give conclusive guidance on claim construction when (1) the specification contained disparaging remarks about a feature or aspect of the art; (2) the purpose of the invention was to overcome that feature or aspect; and (3) every disclosed embodiment lacked that feature. (*See* A00610, A01043.) This is precisely the case here. The Board's attempt to distinguish *Abbott* on the ground that in that case, the "claims themselves suggest[ed]" the more limited construction, is unavailing in light of the Court's focus on the specification itself as "the single best guide to the meaning of a disputed term" (696 F.3d at 1149-50 (citing *Phillips*, 415 F.3d at 1315)), and therefore contrary to this Court's repeated holdings. (A00012-13, A00081-82.)

As the foregoing shows, the Board has not faithfully heeded this Court's teachings that, first and foremost, the intrinsic evidence must guide the scope of a

term.  In *Edwards*, for example, the Court addressed whether claims for a medical stent graft structure included structure wire that was either "resilient" or "malleable," or included *only* malleable wire.  582 F.3d at 1332-33.  This Court found disclaimer of "resilient" wire, despite (i) the lack of an express "malleable" limitation, (ii) only "malleable" wire explicitly appearing in the embodiments, (iii) the "resilient" property not being explicitly disparaged, and (iv) some original claims with a "malleable" limitation being withdrawn in favor of broader claims.  Despite all this, the Court found disavowal of products lacking a "malleable" feature and applied this narrower construction because the general summary described "a feature of the invention" while "criticiz[ing] other products" lacking the same attribute.  *Id.* at 1333.  Similarly here, the shared specification expressly criticizes the characteristics of removable media "hardware units" such as records, tapes, and CDs, and repeatedly describes non-removable hard drives as an essential feature of the invention.  The applicable law thus requires the narrower construction of "second memory."

The Board also relied on SightSound's withdrawal of claims to a "hard disk" to distinguish *Abbott*.  (A00014-15.)  But *Edwards*, otherwise indistinguishable, shows that the withdrawal of narrow claims in favor of broad ones does not negate disclaimer where the patentee continues to limit their scope in prosecution—as

SightSound did here.  The Board's attempt to distinguish *Abbott* is therefore not persuasive.[15]

## B.    The Prosecution History Confirms that Second Memory Excludes Media Similar to Records, Tapes, and CDs

In addition to the specification, the Court should consider the prosecution history in construing claim terms.  *Phillips*, 415 F.3d at 1317.  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id*. (*citing Vitronics*, 90 F.3d at 1582-83).  For example, during prosecution the patentee in *Saffran* distinguished his medical device invention from the prior art as "a sheet rather than a pre formed chamber."  *Saffran*, 712 F.3d at 559.  The Court held it was error to find that disclaimer only excluded the one prior art example: pre-formed chambers.  *Id.* ("[W]e disagree that [patentee's] statements have such limited import.").

SightSound's statements during prosecution and reexamination are consistent with its construction of "second memory."  In 2006, SightSound

---

[15] The Board disregards the "removable" distinction because even hard disks can be removed.  (*See* A00011-12, A00080-81.)  But as SightSound's expert explained, and Apple acknowledged, all hardware is "removable" with enough time and effort.  (A05444045; A00719.)  That pedantic extreme is immaterial, and inappropriately uses extrinsic materials to contradict the intrinsic evidence.

discussed why the patented claims should overcome prior art references, including a kiosk system to transmit audio and video signals to cassette tapes or video disks printed at point-of-sale locations.  In response to an office action, SightSound noted that such references "still required the production of CD's and tapes at the second party's location, with all of the attendant localized problems of production, physical storage, and risk of damages," whereas the '573 patent "solved these problems by providing storage in a non-volatile storage permitting repetitive playback of audio and video without requiring the second party to make, handle, physically store, or otherwise deal with CD's or tapes."  (A04329-30.)

SightSound again addressed precisely this issue in 2010, noting that the specification's reference to "hardware units" meant "removable media" such as cassettes and CD's, which were *not* "second memories" within the meaning of the claims.  (A05113.)  The specification notes that such hardware units contain "drawbacks in light of their *removable nature* and their physical distribution (when compared with a hard disk acting as an internal, non-volatile storage device), and it is those drawbacks that the patented invention seeks to overcome."  (*Id.* (emphasis added).)  The PTO ultimately agreed, distinguishing the invention over prior art expressly because it determined that a narrow construction of "second memory" was appropriate in light of the intrinsic evidence.  (*See* A05168 (interpreting "the

ordinary and customary meaning of 'second memories' as *not* including cassette tapes, CDs *and the like*") (emphasis added).)

Apple's own CBM petitions noted SightSound's successful argument that "'second memory' had to be construed as excluding removable media such as CDs or cassette tapes." (A00442-43, A00868-69.) Apple didn't say this was wrong, and in fact confirmed its understanding that "second memory" required non-removable memory such as a hard disk. (*See* A00434-35 ("The originally-filed claims were directed to electronically transferring binary 'Digital Audio Music' via telephone lines from a seller's hard disk *to the hard disk of a user* in a software configuration allowing for repeated future playback.") (emphasis added), A00856 (same); *see also* A00418 (equating "second memory" with "user's Hard Disk"), A00842 (same); A00429 (same), A00851 (same).) Apple has not shown why its own prior statements in this regard were false.

The Board also utilized a construction of "second memory" that excluded removable media in its institution decision, yet inexplicably and improperly disregarded the intrinsic evidence in favor of a contradictory extrinsic dictionary definition in its final written decision. (*Compare* A00547 ("music is transferred electronically 'via a telecommunications line' to the user and stored *on the user's hard disk*"), A00979 (same), *with* A00011 ("We do not see anything in the Specification indicating that the disclosed method requires a hard disk . . . ."),

A00080 (same).)  Such tendentious resort to extrinsic materials to undermine the intrinsic record is erroneous.  *Cf. Edwards,* 582 F.3d at 1327-28 ("courts may 'rely on dictionary definitions when construing claim terms, so long as the dictionary definition *does not contradict any definition found in or ascertained by a reading of the patent documents.*'") (quoting *Phillips*, 415 F.3d at 1322-23) (emphasis added).[16]

Were a court conducting an infringement analysis, it likely would not hesitate to hold that removable hardware units of the kind used in connection with CompuSonics' DSP-1000 are beyond the scope of the claims and do not fulfill the requirements of "second memory."  *See, e.g.*, *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (narrowing construction of claims in infringement context based on prosecution history as "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers") (citation omitted).  The same analysis should apply in this

---

[16] The Board further erred in concluding that Mr. Hair's statement during prosecution of the '573 patent that "[a]ny suitable recording apparatus controlled and in possession of the second party can be used to record the incoming digital signals" contradicts the construction proposed here.  (A00014-15.)  It is clear from the specification and prosecution history that in order to be "suitable," the recording apparatus must not share the limitations and disadvantages of storing content on a multitude of the disparaged removable "hardware units," and can only effectuate the purpose of the invention by storing onto "one piece of hardware, a hard disk . . . ."  (A00294 col. 2:31-35.)

context, and this Court should find that "second memory" excludes all removable memory sharing the attributes of the prior art tapes and CDs distinguished in the specification and throughout prosecution, and not merely the listed examples alone.

### C.   The Floppy and Optical Disks Contemplated by CompuSonics, Like Records, Tapes, and CDs, Are Not "Second Memories"

When the proper construction is applied, it is clear that the "super-floppy" and optical disks contemplated by CompuSonics cannot qualify as a "second memory" as they share all of the same inefficiencies and limitations of the "hardware units" disparaged in the specification.  (A02191 ("[f]loppy disks had the same limitations as cassettes, VHS tapes and CDs"), A06412 (same); (A02198 (a "removable floppy disk would not meet the objectives of the '573 Specification"), A06419 (similar finding); A02199-201 (a "removable floppy disk as a consumer memory would not allow for the objectives of the '573 Specification"), A06421-23 (similar finding).)  Like CDs, the removable, write-once, read-many disks actually used in consumer DSP-1000's used optical storage.  (*See* A01503-04, A05723-24.) And it is no surprise that "super floppy" disks and other unconventional means of music storage were not expressly included in the specification's basic list of disparaged hardware units, as that specification only expressly discussed the "three basic mediums" on which music was sold, and "[m]usic was not typically, if at all, sold commercially on floppy disks."  (A02218, A06439.)

Floppy and optical disks are removable media that create the same "handling" and "sorting" problems as the "hardware units," and are equally "subject to damage and deterioration" during exposure. (*See* A02190-96, A06412-17; A02218-19, A06439-40.) The method of recording, distribution, and sales alluded to by CompuSonics overcame none of these limitations. The DSP-1000 did not represent a break from the existing music storage paradigm, and CompuSonics' devices are now a footnote in the history of exotic yet unsuccessful stereo components. For these reasons, CompuSonics' floppy and optical disks cannot be "second memories" within the meaning of the SightSound patents.

## IV.  THE SIGHTSOUND PATENTS ARE NOT OBVIOUS IN VIEW OF THE COMPUSONICS REFERENCES

The Court should vacate the Board's determination that the challenged claims are obvious. The ruling was both procedurally and substantively erroneous.

### A.  The Board Erroneously Identified a Rationale for Combining the CompuSonics References for the First Time in its Final Written Decisions

As an unsurprising consequence of the highly unusual and *ultra vires* manner in which the obviousness ground was taken up, briefed, and argued, the Board's ultimate obviousness ruling was infected with error. While the Supreme Court has eschewed any rigid test for combining references, it emphasized the need for "an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). In

other words, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citation and internal quotation marks omitted).

Here, after considering a ground never argued in Apple's petitions, the Board left itself no choice except to devise its own arguments as to why a person of ordinary skill would have had reason to combine the CompuSonics references. This was clear legal error. As this Court has held, the Board may not provide its own rationale for combining references, as it did here, in its final written decisions. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1258 (Fed. Cir. 2013).

In *Rambus*, the Court vacated the Board's decision sustaining rejection of claims during reexamination where the Board supplied its own reasons to combine two prior art references. As the *Rambus* Court explained, the Board must, under the Administrative Procedure Act, ensure that the parties before it are "fully and fairly treated at the administrative level." *Id.* at 1255 (quoting *In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011)). Due process mandates that the Board provide "prior notice to the applicant of all 'matters of fact and law asserted'" before rendering a final decision. *Id.* at 1255-56 (quoting *In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011)). That did not happen below.

To support its adventitious rearrangement of bits and pieces of twelve references, the Board said these items "describe technology developed by the same company (CompuSonics), use similar terminology, and pertain generally to the recording of digital audio or video." (A00041-42, A00109.) The Board provided no legal support for combining all development efforts by a given company, and instead cited two distinguishable cases.

In the first case, *In re Hyon*, 679 F.3d 1363, 1366-67 (Fed. Cir. 2012), a divided panel of this Court, applying a deferential "substantial evidence" standard, affirmed an examiner's combination of two patents for producing ultra-high molecular weight polyethylene to render obvious a technique for producing the same compound, as the prior art clearly disclosed all steps necessary to the new method, albeit in a modified order. In the second, *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166-67 (Fed. Cir. 2006), a panel of this Court applied the even more deferential "clear error" standard to affirm a motivation-to-combine finding in light of "guidance" toward a particular solution that was "quite clear" from the prior art. In both cases, the Court affirmed a timely asserted and fully substantiated motivation to combine. In contrast, Apple's papers never suggested the combination adopted by the Board, and the CompuSonics references themselves do not point to the particular invention claimed by the SightSound patents, much less give "quite clear" guidance, as CompuSonics quickly grew

frustrated with and *abandoned* efforts to develop "tele-recording."  (A05331; *see N2K*, 391 F. Supp. 2d at 353 & n.27.)

While the Board permitted SightSound to file a sur-reply in response to Apple's arguments—after the Board heard oral argument—SightSound still lacked notice of what specific obviousness combinations were being advanced, or even considered by the Board.  (A00817-19, A01246-48.)  The Board then scoured a dozen references to divine for the first time in its adjudication a new combination never argued by the parties and a motivation to combine not supported by the evidence.  It cannot be overstated that such a process—under which a patent holder loses valuable property rights without fair warning and a meaningful opportunity to be heard—is at odds with the purpose and scope of CBM review and due process rights.  The same fundamental fairness requirements articulated by this Court in *Rambus* apply here, mandating *vacatur* of the Board's decisions.

### B.    The Board Erred in Determining That Claims 1, 2, 4 and 5 of the '573 Patent and Claim 1 of the '440 Patent Were Obvious

Even if the Board's self-formulated obviousness analysis were to be considered on the merits, it must be vacated for claims 1, 2, 4 and 5 of the '573 patent and claim 1 of the '440 patent as it is based on an erroneous interpretation of "second memory."  When properly construed and considered under the correct legal framework, the claims are non-obvious.

The Supreme Court has made clear that "[a] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the art." *KSR*, 550 U.S. at 418. Indeed, most claimed inventions consist of elements that already existed in the prior art. *Id.* at 418-19. The critical question is whether the overall "improvement" or combination would have been obvious. *See id.* at 425; MPEP § 2141.02 ("In determining the differences between the prior art and the claims, the question under 35 U.S.C. 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious.") (citations omitted).

As SightSound argued below, while various claim elements may have been known and used *individually* in the prior art—computers, hard drives, telecommunications lines—the *combination* of elements in the manner claimed was groundbreaking and did not yield a predictable result. (A00822-23, A01251-52.) In fact, the combination was directly contrary to the paradigm of prior art distribution systems, where consumers purchased music or videos in the form of physical units (records, tapes, CDs, *etc.*) and played them on a dedicated consumer electronics device (as CompuSonics envisioned with its DSP-1000s playing floppy or optical disks). (A00822-23, A01251-52.)

The CompuSonics references never described or contemplated that a purchaser of digital audio or video signals would store the received digital signals in the "second memory" of the claims—*i.e.,* non-removable media such as a hard disk. Rather, the references disclose only the use of removable media, such as floppy and write-once optical disks, as the device on which consumers would store digital signals that were fused in fixed form to the physical media.

The differences between the CompuSonics references and the claimed methods were not obvious. Although it was Apple's burden to raise and prove obviousness and not SightSound's burden to establish the contrary, SightSound provided substantial evidence of non-obviousness. Among other things, market forces and technical constraints in 1988 would have driven a skilled artisan reading the CompuSonics references away from using non-removable media to store purchased digital audio or video signals.

Market forces in the recording industry in 1988—an important consideration in the obviousness inquiry (*see KSR*, 550 U.S. at 417)—were highly resistant to the very notion of selling and transmitting digital audio or video signals for storage on non-removable media such as a hard disk. In 1988, stakeholders in the music and recording industry were not willing to sell digital music directly to consumers in a manipulable form to be stored on the hard drives of consumers' home computers, which presented far too great a risk of unauthorized copying or mass replication

and piracy.  (*See* A02214-17, A06435-38; (A05626-27 ("[E]ncryption and

copyright protection were a significant concern for the record labels."), A09857-58

(same).)  The recording industry was far more comfortable with consumers owning

music in a fixed form fused to numerous physical units which presented fewer,

reasonably well-understood risks in this regard.  (*See* A02214-17, A06435-38.)

Moreover, no one was looking to "solve" the problem of physical media

during the relevant time period because it was not a recognized problem.

(A02221-22, A06442-43; *see Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346,

1353, 1356-57 (Fed. Cir. 2013) ("As an initial matter, an invention can often be the

recognition of a problem itself."); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372,

1377-78 (Fed. Cir. 2012) ("Often the inventive contribution lies in defining the

problem in a new revelatory way.  In other words, when someone is presented with

the identical problem and told to make the patented invention, it often becomes

virtually certain that the artisan will succeed in making the invention.").)

Quite the opposite, the so-called "CompuSonics publications" reflect the

long-held belief at that time that the only model for selling and distributing music

was the sale of dedicated physical articles on which music was stored and played

back on stereo equipment.  CompuSonics intended for the DSP-1000 to become

the next generation of equipment in this model, playing music on floppy or optical

disks which it hoped would become the next standard in removable media,

replacing the CD.  (*See, e.g.*, A05246-47 ("Music recorded digitally can be cued on

a disk and called up almost instantly, without all the rewinding necessary with

tapes . . . .  Compusonics plans to launch a $1,200 digital recorder for the home

that will make recordings on a floppy disk . . . .  CompuSonics wants to win

audiophiles before the Japanese decide to go with digital tape.  To make its floppy

disks the standard, the company plans to license the technology cheaply to other

manufacturers.").[17]

From a technical perspective, Apple's own experts also confirmed that hard

drives would not have been desirable during the relevant time period.  (*See*

A05627-28 ("[H]ard disks were a prime example of the high cost of storage at the

time."), A09858-59 (same); A05632 ("I understand from Dr. Kelly that most hard

drives at the time did not even have 150 megabytes of storage."), A09863 (same);

A05653-54 ("[I]n 1988 removable media storage devices could have larger

---

[17] *See also* A05192-05196 (describing potential future scenarios where consumers owning CompuSonics DSPs will "no longer want to purchase records or tapes. Instead, they want to purchase floppy disks on which to store musical selections."); A05322-24 (noting that CompuSonics founder David Schwartz envisioned music being recorded directly onto floppy disk, "without the need for tapes or vinyl recordings.  If that happens, it would be good news for CompuSonics, which not only has a floppy disk-based digital recorder for broadcast use on the market, but has been trying to break into the consumer marketplace with its floppy disk-based DSP-1000."); A05188-90 (reporting that CompuSonics, a "manufacturer of digital audio equipment," envisioned selling a "consumer digital audio recorder/player (which has yet to see production), which would record the transmission onto a five-and-a-quarter-inch 'super-floppy' disk").

capacity than non-removable media storage devices."), A09884-86 (same); A02828-30 ("So around 1988, the hard drives were very delicate . . . so physical damage to a hard drive occurred regularly.").)  Similarly, CompuSonics' second employee and the President of CompuSonics Video Corporation, John Stautner, testified that while CompuSonics was aware of hard drives, it viewed them as an inferior medium to store audio signals for consumers because of the expense, noise and general impracticality.  (A01502-03, A05722-23.)  To the extent CompuSonics even articulated the general concept of selling digital signals to consumers, Mr. Stautner testified that "[a]ll of these ideas involved the concept that the audio signals would be recorded onto floppy disks or other removable media."  (A01506-07, A05726-27.)  This testimony is unrebutted, and the CompuSonics publications make clear that CompuSonics never contemplated the revolutionary step of selling digital signals in manipulable form free of removable physical media "hardware units."

Thus, when obviousness is considered based upon a correct claim construction and informed consideration of the background of the prior art, the claims would not have been obvious in view of the CompuSonics references.  *See Amkor Tech., Inc. v. ITC*, 692 F.3d 1250, 1258 (Fed. Cir. 2012) (reversing obviousness determination where the challenger failed to show that one of ordinary

skill in the art would have had any reason or motivation to alter the prior art in the manner claimed).

## C.    The Board Erred in Determining that Claims 64 and 95 of the '440 Patent Were Obvious

The Board further erred in constructing its own obviousness analysis for claims 64 and 95 of the '440 patent.  Among other things, these claims explicitly require that purchased digital audio or video signals be transferred and stored into a "second party hard disk."

According to the Board, because certain CompuSonics references taught hard-disk storage of digital audio or video signals (for purposes other than receiving and storing the signals as required in claims 64 and 95), a person of ordinary skill would have had reason to adapt the teachings to achieve the methods recited in those claims.  (A00122-25.)  The Board relied on the fact that a hard disk "would function for its known purpose of storing digital data."  (A00124.)  The Board, however, reached its conclusion by myopically and improperly focusing on whether it would have been obvious to use a hard disk, which CompuSonics rejected as unsuitable for its consumer device (*see* A05722-23), in lieu of the removable optical or floppy media actually taught by CompuSonics.

Putting aside its factual implausibility, the Board's component-centric analysis failed to examine obviousness in the legally relevant context of the overall claimed method.  *See* MPEP § 2141.02 ("In determining the differences between

the prior art and the claims, the question under 35 U.S.C. 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious.") (citations omitted).  Among other things, the Board failed to consider the entrenched market mindset and forces associated with the sale of music and video via physical storage units circa 1988, as well as the technical constraints that existed at that time, which would have led the person of ordinary skill away from use of a hard disk for storage of purchased and received digital signals.  *See Amkor*, 692 F.3d at 1258; *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1353 (Fed. Cir. 2014) (reversing obviousness determination where, among other things, there was no evidence that a person of ordinary skill would have combined the prior art references to achieve the result of the claims).

In its final written decision, the Board put near-dispositive weight on a CompuSonics reference that expressly noted that only CompuSonics' *professional* devices used a hard disk, while its consumer devices would "make recordings on a floppy disk."  (A00122-24 (citing A05246-47).)  Ignoring these diverging teachings, the Board asserted that it "would have suggested to a person of ordinary skill in the art to use a hard disk, rather than a floppy disk," given the greater storage capacity of a hard disk.  (A00124.)  Again, the Board never explains why this reference would have led a skilled artisan to use a hard disk in the manner

claimed, particularly in view of the evidence described above. The Board also relied upon Apple's expert's unremarkable reply assertion that a person of ordinary skill would have expected capacity of storage devices to increase and prices to decrease. (A00125.) This pabulum merely restates Moore's law, and is devoid of any analysis in the context of the overall claimed method. Apple's expert provided no explanation as to why—even if his assertion is accepted as true—one skilled in the art would have chosen a hard disk over floppy or optical disks, which a skilled artisan presumably would also expect to increase in storage capacity and decrease in price over time. Nor does it overcome CompuSonics' aversion to, and clear election not to use, hard disks with its consumer stereo equipment. (*See* A05723-24.)

In stark contrast, the inventor of the SightSound patents was an engineer who was willing to disrupt the music industry's existing sales paradigm and brought a technical focus unwedded to a desire to sell stereo equipment (as was CompuSonics' objective). Namely, Mr. Hair, who later became CTO of a major film studio, "understood that music and video sales were being hampered by their removable media" (A06439) and offered the insight that non-removable memory could be used in the context of an overall method for the purchase, transmission, and storage of digital audio or video signals. These non-removable memories were distinct from floppy disks, records, tapes, and CDs in that they permitted the user

to have digital signals in one repository that eliminated unnecessary handling of hardware units, thus allowing users to create and change playlists, *etc.*  (*See* A00379 col. 2:40-61 ("The high speed transfer of Digital Audio Music as prescribed by this invention is stored onto *one piece of hardware, a hard disk* . . . .") (emphasis added).)  This was a truly revolutionary and non-obvious invention for its time.

### D.    The Board Overlooked Strong Indicia of Non-Obviousness

The Board also erred in its rejection of objective indicia of non-obviousness. As this Court has explained, objective indicia are "not just a cumulative or confirmatory part of the obviousness calculus but constitute[] independent evidence of nonobviousness."  *Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).  They can compel a finding of nonobviousness even where "standing alone, the prior art provides significant support for the [] contention that the [] patent would have been obvious."  *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1499 (Fed. Cir. 1986).

Here, at the very least, Apple's commercial success of iTMS—which utilizes the claimed invention—demonstrates the non-obviousness of the claims. Despite being hamstrung by the Board's refusal to permit discovery on the issue of commercial success, SightSound nevertheless presented evidence not just of the

undisputed commercial success of iTMS, but also of the nexus between such

success and the claimed invention.  (A00651-65, A01081-95.)

In its final written decisions, the Board rejected the nexus showing, crediting

the testimony of Apple's witnesses that the success of iTMS was due to factors

outside the scope of the claims, including (i) content selection and (ii) the iTMS

"user interface."  Even if non-patented features contributed to the success of iTMS,

the Board's conclusion that there was *no* nexus between the success and the

claimed invention lacks substantial evidence.

As a threshold issue, SightSound was not required to show that the claimed

invention was the *sole* reason for iTMS's success.  Courts find commercial success

in support of non-obviousness even where that success was also due to external

factors, such as the availability or lack of raw materials.  *Henkel Corp. v. Coral,*

*Inc.*, 754 F. Supp. 1280, 1319 (N.D. Ill. 1990), *aff'd mem.*, 945 F.2d 416 (Fed. Cir.

1991) (unpublished) ("Evidence that the success of the claimed invention may

have been due in part to increased energy costs does not preclude finding of

commercial success."); *Mendenhall v. Astec Indus. Inc.*, 13 U.S.P.Q. 2d (BNA)

1913, 1942 (E.D. Tenn. 1988), *aff'd mem.*, 887 F.2d 1094 (Fed. Cir. 1989)

(commercial success supported non-obviousness even when the success of the

patented invention relating to asphalt recycling was also due to increased oil prices

and the limited supply of raw materials).

Even if the success of iTMS was due to *both* Apple's use of SightSound's invention *and* the availability of desirable content when iTMS was launched (the "raw materials" which were not available when SightSound tried to commercialize its invention several years earlier due to distinct market dynamics (*see* A01487-88, A05707-08; A01492, A05712)), this does not negate the nexus showing.

The Board's decision to credit the opinion of Apple's witness that the success of iTMS was due to certain features of the iTMS user interface, which closely resembled the interface and website launched in the 1990s by SightSound, was not only factually flawed but logically impossible.  For example, Mr. Kenswil touted the "Genius" feature, which provides recommendations based on past purchases, as one of the features important to the success of iTMS.  (A05642-43, A09873-74.)  The Genius feature, however, was not available until 2008, and Apple's own witnesses testified that the iTMS was already a commercial success several years earlier when it launched in early 2003.  (A02346-47; A02395; A02414-16.)  The Board credited wholesale Apple's reliance upon similar features, such as the five-star and song-by-song popularity ratings, background information features, as well as other "features related to popularity, recommendations, and lists of what other content was often purchased by people who bought song/movie being viewed," as driving the success of iTMS.  (A00047-49 (citing Mr. Kenswil's opinions)), A00114-16 (same).)  But Apple presented no evidence, and its expert

simply did not know, when such features were introduced and what impact there would have been on sales through iTMS had those features not been included in iTMS. (A02346-47; A02391-98; A02415-16.)

Similarly flawed was the Board's decision to credit statements by Apple's declarants that iTMS "embodies numerous inventions other than the general purchasing and downloading of music," namely an assemblage of Apple's own patents. (A00044-46, A00112-13.) This evidence was unsupported and conclusory. Apple witness Jeffrey Robbin did not bother to review the patents that he alleged iTMS embodies before signing his declaration, could not confirm that he had ever reviewed the issued claims, and did not know when the applications had been filed. (A05606-07, A09837-38; A03283, A03284-85; A03317-18.) Given these admissions, there is no reliable evidence in the record that the inventions disclosed in Apple's patents are part of iTMS, and especially no evidence that these inventions were present in iTMS when it launched to immediate commercial success.

Even if these witnesses were credited, they confirmed the importance and nexus of the patented method to the fundamental shift in the market beginning in the late 1990s. Apple's technical expert referred to the claimed invention as a "general concept that preempts the entire field of electronic sale with digital audio and video signals" (A02059), whereas its "music industry" expert testified that the

claims of SightSound's patents "were certainly necessary for digital sales" (A02345).

Apple's industry expert further identified the very benefits described in the specification of the SightSound patents for the claimed invention as the "main reasons" that music downloads replaced physical media sales, including the benefits of storing the purchased audio or video signals in a non-removable "second memory." (*Compare* A02410-11, A02429, *with* A00294 col. 2:31-50, A00379 col. 2:44-61, A00295 col. 4:52-55, A00381 col. 5:1-4.) Specifically, he testified that "there are people who value buying music online" and some iTMS consumers make a choice to acquire music in a particular format. (A02372.) "[T]he number one reason" that digital downloads began replacing physical medial sales "was disaggregation . . . . [T]he consumer now had the choice to buy one or two tracks for a dollar each rather than having to pay 12 to $16 for an entire CD. That was a huge incentive to switch to buying that way . . . . [Consumers] enjoyed the flexibility of listening to music by their own play lists so they could re-order the songs which—having basically a track-by-track jukebox facilitated as opposed to having to put CDs in and out of a CD player . . . . [T]hose are the main reasons why it took off as it did as industry format." (A02410-11, A02429.)

Yet, the Board failed to even address this evidence tying commercial success to the stated advantages of the claimed invention. *See, e.g.*, *Diversitech Corp. v.*

*Century Steps, Inc.*, 850 F.2d 675, 679 (Fed. Cir. 1988) (reversing findings of obviousness and lack of nexus to commercial success where the "commercial success was due, at least in part, to one of the four advantages set forth in the patent specification"). These objective indicia further support the determination of non-obviousness.

## CONCLUSION

For the reasons stated herein, SightSound respectfully requests that the Court order that the October 7, 2014 final written decisions of the Board be vacated and the underlying CBM proceedings be dismissed.

DATED: January 13, 2015                    Respectfully submitted,

By: */s/ Matthew M. Wolf*
Matthew M. Wolf
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Jennifer A. Sklenar
Arnold & Porter LLP
777 South Figueroa Street
44th Floor
Los Angeles, California 90071
Telephone: (213) 243-4027
Facsimile: (213) 243-4199

*Counsel for Patent Owner-Appellant*
*SightSound Technologies, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2015, a true and correct copy of the foregoing was served upon the following counsel of record via email through the court's CM/ECF system:

J. Steven Baughman
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Steven.Baughman@ropesgray.com

Ching-Lee Fukuda
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Ching-Lee.Fukuda@ropesgray.com

Douglas Hallward-Driemeier
Darrell Stark
Megan Raymond
Paul Schoenhard
ROPES & GRAY LLP
One Metro Center
700 Twelfth Street, NW
Washington, DC 20005
Douglas.Hallward-Driemeier@ropesgray.com
Darrell.Stark@ropesgray.com
Megan.Raymond@ropesgray.com
Paul Schoenhard@ropesgray.com

James R. Batchelder
Lauren N. Robinson
ROPES & GRAY LLP
1900 University Avenue
East Palo Alto, CA 94303
James.Batchelder@ropesgray.com
Lauren.Robinson@ropesgray.com

*/s/ Matthew M. Wolf*
Matthew M. Wolf

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) as modified by the Court's Order dated January 5, 2015, which ordered that appellant's opening brief not exceed 16,500 words.  The brief contains 16,237 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

*/s/ Matthew M. Wolf*
Matthew M. Wolf
*Counsel for Patent Owner-Appellant*
*SightSound Technologies, LLC*