Nos. 2015-1159, 2015-1160

---

# United States Court of Appeals
# for the Federal Circuit

---

SIGHTSOUND TECHNOLOGIES, LLC,

*Patent Owner-Appellant,*

v.

APPLE INC.,

*Petitioner-Appellee.*

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. CBM2013-00020 and CBM2013-00023.

---

## BRIEF OF APPELLEE APPLE INC.

James R. Batchelder
Lauren N. Robinson
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Telephone: (650) 617-4000
Fax:  (650) 617-4090

Ching-Lee Fukuda
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Fax:  (212) 596-9090

April 13, 2015

Douglas H. Hallward-Driemeier
J. Steven Baughman
Paul M. Schoenhard
Megan F. Raymond
Sharon Lee
Darrell W. Stark
700 12th Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
Fax:  (202) 508-4650

**ROPES & GRAY LLP**

*Counsel for Appellee Apple Inc.*

Form 9

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SightSound Technologies, LLC _____ v. Apple Inc. _____

No. 2015-1159

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner) (appellant) (respondent)~~ (appellee) ~~(amicus)~~ (name of party)

Apple Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Apple Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Apple Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.   ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

See attached list.

_____

December 5, 2014 _____              /s/ Douglas H. Hallward-Driemeier _____
        Date                                     Signature of counsel

                                          Douglas H. Hallward-Driemeier _____
                                              Printed name of counsel

Please Note: All questions must be answered
cc: Counsel of record _____

124

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the agency or are expected to appear in this court are:

Ropes & Gray LLP: Douglas H. Hallward-Driemeier, J. Steven Baughman, James R. Batchelder, Ching-Lee Fukuda, Paul M. Schoenhard, Megan Raymond, James R. Myers, Lauren Robinson, Darrell Stark, Sharon Lee, Diana Santos, Jordan Rossen, Joseph Van Tassel, and Daniel Keese (no longer at Ropes & Gray).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

TABLE OF ABBREVIATIONS ........................................................ ix

STATEMENT OF RELATED CASES ................................................x

STATEMENT OF JURISDICTION...................................................1

COUNTER-STATEMENT OF THE ISSUES ....................................2

STATEMENT OF THE CASE.........................................................3

I.     CompuSonics ..........................................................................3

II.    SightSound's Patents ..............................................................9

III.   Procedural Background .........................................................10

      A.    The Board Proceedings .............................................11

      B.    The Board's Final Written Decisions.........................13

           1.    The Board's Construction Of "Second Memory" ...................13

           2.    The Board's Confirmation Of Its Jurisdiction .........................18

           3.    The Board's Decision On Obviousness ...................................19

                (a)    The Teachings of the CompuSonics Disclosures ...........19

                (b)    Motivation to Combine...................................................20

                (c)    Secondary Considerations .............................................21

           4.    The Board's Decision On Anticipation ...................................23

SUMMARY OF THE ARGUMENT ...................................................25

ARGUMENT ................................................................................27

I.     Standard of Review...............................................................27

II.    The Board Correctly Concluded That Claims 1, 2, 4, and 5 Of The '573 Patent And Claims 1, 64 And 95 Of The '440 Patent Are Obvious .....28

      A.    Legal Standards—Obviousness, Motivation To Combine, Secondary Considerations .................................................29

**TABLE OF CONTENTS**
**(Continued)**

B. The Board Correctly Found That The CompuSonics Disclosures Disclose The "Second Memory" And "Second Party Hard Disk" Limitations Of The Challenged Claims .................31

    1. The Board Correctly Determined That "Second Memory" Is Not Limited To Non-Removable Media..............................32

    2. The Board Correctly Found That The CompuSonics Disclosures Disclose A "Second Memory"..............................38

    3. The Board Correctly Found That The CompuSonics Disclosures Disclose A "Second Party Hard Disk"..................41

C. The Board Correctly Found That A POSITA Would Have Been Motivated To Combine The CompuSonics Disclosures ..........44

D. The Board Correctly Found That SightSound Failed To Establish That Secondary Considerations Preclude A Finding Of Obviousness ..................................................................................47

III. This Court Does Not Have Jurisdiction To Review The Board's Decisions On Institution, Which Were, In Any Event, Correct ...................52

A. SightSound's Challenge Is An Impermissible Attack On The Board's Institution Decisions ..............................................53

B. SightSound Has Not Established A Right To Mandamus, Even If Not Precluded By § 324. The Board's Decision To Institute CBMR On Obviousness Grounds Was Proper ...................56

C. The Board Correctly Determined That The '573 Patent And The '440 Patent Are Eligible For CBMR ...........................................60

D. Alternative Ground For Affirmance: Claims 1, 2, 4, And 5 Of The '573 Patent And Claims 1, 64 And 95 Of The '440 Patent Were Anticipated By The CompuSonics Disclosures ........................66

CONCLUSION ......................................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*In re Abbott Diabetes Care, Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012) ...................................................15, 36

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
    607 F.3d 817 (Fed. Cir. 2010) ...........................................................52

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014)........................................................................10

*In re Antor Media Corp.*,
    689 F.3d 1282 (Fed. Cir. 2012) ........................................................70

*Arbaugh v. Y & H Corp.*,
    546 U.S. 500 (2006)............................................................................53

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    632 F.3d 1246 (Fed. Cir. 2011) ........................................................37

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) ...................................................32, 36

*In re Baxter Int'l, Inc.*,
    678 F.3d 1357 (Fed. Cir. 2012) ........................................................58

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ........................................................70

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
    229 F.3d 1120 (Fed. Cir. 2000) ...................................................48, 60

*buySAFE Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ........................................................10

*In re Comiskey*,
    554 F.3d 967 (Fed. Cir. 2009) ..........................................................67

*Connell v. Sears, Roebuck & Co.*,
   722 F.2d 1542 (Fed. Cir. 1983) ..........................................................60

*In re Cuozzo Speed Techs., LLC*,
   778 F.3d 1271 (Fed. Cir. 2015) ................................................*passim*

*Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988) ..........................................................30

*Dickinson v. Zurko*,
   527 U.S. 150 (1999)...................................................................27, 28

*Duncan v. Walker*,
   533 U.S. 167 (2001)...........................................................................55

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) ..........................................................29

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
   227 F.3d 1361 (Fed. Cir. 2000) .......................................67, 68, 70, 72

*Epsilon Data Mgmt., LLC v. RPost Commc'ns Ltd.*,
   No. CBM2014-00017, 2014 WL 1628569 (P.T.A.B. Apr. 22, 2014)...............65

*Experian Mktg. Solutions, Inc. v. RPost Commc'ns Ltd.*,
   No. CBM2014-00010, 2014 WL 1628568 (P.T.A.B. Apr. 22, 2014)...............65

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ...........................................27, 28, 44

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004) ..........................................................37

*In re Huang*,
   100 F.3d 135 (Fed. Cir. 1996) .....................................................30, 47

*In re Hyon*,
   679 F.3d 1363 (Fed. Cir. 2012) ..........................................................44

*In re Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) ...........................................30, 32, 47

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
    No. 2014-1350, --- F.3d ----, 2015 WL 1319364 (Fed. Cir. Mar. 25,
    2015) ............................................................................................................... 63

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................. 29, 30, 44, 45

*In re McDaniel*,
    293 F.3d 1379 (Fed. Cir. 2002) ........................................................... 60

*In re Mettke*,
    570 F.3d 1356 (Fed. Cir. 2009) ........................................................... 44

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ..................................................... 30, 47

*Par Pharm., Inc. v. Jazz Pharms., Inc.*,
    Nos. CBM2014-00149, CBM2014-00150, CBM2014-00151, CBM
    2014-00153, 2015 WL 216987 (P.T.A.B. Jan. 13, 2015) .................................. 65

*PNC Fin. Servs. Grp., Inc. v. Intellectual Ventures I LLC*,
    No. CBM2014-00032, 2014 WL 2174767 (P.T.A.B. May 22, 2014) .............. 65

*In re Procter & Gamble Co.*,
    749 F.3d 1376 (Fed. Cir. 2014) ........................................................... 54

*In re Rambus, Inc.*,
    753 F.3d 1253 (Fed. Cir. 2014) ..................................................... 28, 45

*Rambus Inc. v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) ..................................................... 45, 46

*Rexnord Indus., LLC v. Kappos*,
    705 F.3d 1347 (Fed. Cir. 2013) ........................................................... 67

*Salesforce.com, Inc. v. Applications in Internet Time LLC*,
    No. CBM2014-00162, 2015 WL 470746 (P.T.A.B. Feb. 2, 2015) .................... 65

*In re Sullivan*,
    498 F.3d 1344 (Fed. Cir. 2004) ........................................................... 27

*Thorner v. Sony Computer Entm't Am., LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................... 32, 33

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..............................................................10

*United States v. Menasche*,
    348 U.S. 528 (1955)...............................................................................55

*Woodland Trust v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998) ......................................................69, 72

## STATUTES AND REGULATIONS

5 U.S.C. § 706..............................................................................................27

35 U.S.C. § 101 ...........................................................................................10

35 U.S.C § 102(a) ................................................................................*passim*

35 U.S.C. § 103(a) ...........................................................................2, 25, 29

35 U.S.C. § 314(d) .......................................................................................53

35 U.S.C. § 324(a) .......................................................................................59

35 U.S.C. § 324(e) ...............................................................................*passim*

35 U.S.C. § 328(a) .......................................................................................54

37 C.F.R. § 42.208(c)............................................................................12, 58

37 C.F.R. § 42.301 ...............................................................................63, 66

Leahy-Smith America Invents Act, Pub. L. No. 112-29,
    125 Stat. 284 (2011)......................................................................*passim*

## OTHER AUTHORITIES

157 Cong. Rec. H4497 (daily ed. June 23, 2011)....................................66

157 Cong. Rec. S5433 (daily ed. Sept. 8, 2011).....................................66

157 Cong. Rec. S5441 (daily ed. Sept. 8, 2011).....................................66

## TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| SightSound | Appellant SightSound Technologies, LLC |
| Apple | Appellee Apple Inc. |

*Patents and References*

| | |
|---|---|
| '573 Patent | U.S. Patent No. 5,191,573 |
| '440 Patent | U.S. Patent No. 5,966,440 |

*Defined Terms*

| | |
|---|---|
| AIA | Leahy-Smith America Invents Act |
| APA | Administrative Procedure Act |
| Board | Patent Trial and Appeal Board |
| CBM | Covered Business Method |
| CBMR | Covered Business Method Review |
| POSITA | Person of ordinary skill in the art |
| PTO | U.S. Patent and Trademark Office |

**All emphasis added unless otherwise indicated.

***Consistent with Appellant's Brief, citations to identical record entries in both CBMR proceedings will include only the CBM2013-00020 entry and citations to non-identical record entries will include both the CBM2013-00020 and CBM2013-00023 entries.

## STATEMENT OF RELATED CASES

Apple's counsel is unaware of any related proceedings within the meaning of Federal Circuit Rule 47.5(a).

## STATEMENT OF JURISDICTION

The PTO had jurisdiction over the Petitions for Covered Business Method Review filed by Apple under 35 U.S.C. § 321 and § 18 of the AIA. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and § 6(d) of the AIA as codified at 35 U.S.C. § 329 to review the Board's October 7, 2014 Final Written Decisions with respect to patentability. This Court does not, however, have jurisdiction to review the Board's decision to institute CBMR proceedings. 35 U.S.C. § 324(e) ("No Appeal.— The determination by the Director whether to institute a post-grant review [or CBMR] under this section shall be final and nonappealable."); *see also In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271 (Fed. Cir. 2015).

## COUNTER-STATEMENT OF THE ISSUES

SightSound challenges the Board's Final Written Decisions invalidating certain claims of U.S. Patent Nos. 5,191,573 ("the '573 Patent") and 5,966,440 ("the '440 Patent"). Although SightSound identifies five issues it asks this Court to consider, there are only two ultimate issues for this Court to decide:

I.     Whether the Board correctly concluded that claims 1, 2, 4, and 5 of the '573 Patent and claims 1, 64, and 95 of the '440 Patent are unpatentable under 35 U.S.C. § 103(a), where substantial evidence supports the Board's findings that (a) the references describing how CompuSonics' telerecording process and Digital Signal Processor products could be used ("the CompuSonics Disclosures") disclosed every limitation of the claims, including the only limitations challenged as absent by SightSound on appeal—"second memory" and "second party hard disk"; (b) a person of ordinary skill in the art would have been motivated to combine the CompuSonics Disclosures; and (c) secondary considerations do not overcome the showing of obviousness.

II.     Whether, especially in view of this Court's recent decision in *In re Cuozzo Speed Technologies, LLC*, 778 F.3d 1271 (Fed. Cir. 2015), the AIA bars review of SightSound's "jurisdictional" challenges to the Board's institution decisions, which challenges, in any event, lack merit.

-2-

## STATEMENT OF THE CASE

The concept and advantages of electronically selling and transmitting digital music and video were well known before the 1988 priority date of SightSound's patents. This concept was addressed in a host of prior art, including disclosures pertaining to a company called CompuSonics.

## I.    CompuSonics

Before 1988, CompuSonics[1] developed recorder/players to transmit, receive, store, and play digital audio and video. CompuSonics publicly demonstrated its recorder/players, patented its underlying technology, and promoted the use of its recorder/players for facilitating the sale and distribution of digital audio and video over telecommunications lines, such as telephone, T1, and cable lines.

Like others in the same period,[2] CompuSonics appreciated that once audio or video was in digital form, it could be distributed just like any other data, including directly to record stores and consumers over telephone, T1, and cable

---

[1]    CompuSonics Corp. focused on digital audio, while CompuSonics Video Corp. focused on digital video. CompuSonics Corp. and CompuSonics Video Corp. are collectively referred to as "CompuSonics."

[2]    For example, in a 1986 interview, record label executive Jimmy Bowen stated:

> I see the time down the road, probably 10 years, when you'll be able to dial a series of numbers on your telephone and get a digital album over the phone line into your incoder [*sic*] in your home. In five minutes, you can have a new album. It's on your telephone bill or it's on your credit card or whatever.

(A04000-A04001.)

lines. (A12703.) For example, as depicted below, CompuSonics' devices, called

Digital Signal Processors ("DSPs"), included built-in communication interfaces for

use with a telephone line, and saved received digital audio to disk:



(A12703; *see also* A05191.) As described below, a DSP could download digital

data from a remote source to a local disk (a process CompuSonics termed

"telerecording"), and play back the stored digital data. (*See, e.g.*, A12706 ¶ 4.)

As early as 1984, CompuSonics described using telerecording for electronic

sales and distribution of digital music:

> In the not too distant future ***consumers will be able to purchase
> digital recordings of their favorite artists directly from the
> production studio's dial-up data base and record them on blank
> SuperFloppies in a DSP-1000***.

-4-

(A05197.)  That same year, *Fortune* reported:

> CompuSonics is talking to AT&T about setting up a service that would enable record companies to **sell direct to consumers over the telephone. Symphonies, ordered by credit card, could travel digitally over phone lines into homes to be recorded by CompuSonics' machine.** Movies, which can also be recorded digitally, might be sent the same way.

(A05247.)

In 1985, CompuSonics publicly demonstrated transmission of digital audio over AT&T's Accunet between two of its DSP-2002 recorder/players, which included internal hard drives.  (Appellant's Br. at 15, 17; A01158 at 18:9-18; A12703.)  CompuSonics used "AT&T's land-based telephone data transmission system to digitally transmit and receive music between Chicago and New York." (A05190.)  As *Billboard* reported, telerecording would "allow music software dealers to receive an album master via a digital transmission from the record company," and "[t]he retailers would then be able, in turn to **digitally transmit the music** to consumers who would use credit cards to **charge their purchases over the phone lines**," facilitating an "electronic record store."  (*Id.*)

Five days after that article appeared in *Billboard*, David Schwartz, the founder and President of CompuSonics, again described telerecording and the electronic record store concept in a letter to shareholders.  Mr. Schwartz emphasized that telerecording could be used for all-electronic purchase and receipt of music:

> AT&T's commitment to telerecording may hasten the arrival of that day, in the not too distant future, when the technology will filter down to the consumer level, allowing ***all-electronic purchases***, transfers and digital recording of high fidelity audio ***from any music dealer's DSP-2000 to the DSP-1000 in your living room***.

(A05209.)

In a 1987 lecture at Stanford University, Mr. Schwartz presented CompuSonics' technology and, like the description in the *Billboard* article, explained how telerecording could be used for electronically selling and distributing digital content. Mr. Schwartz presented a slide detailing digital audio distribution, including a "dial-up electronic record store" enabled by CompuSonics' technology:



(A12704.) He further explained:

> **Obviously** if you have a computer you want to transmit data to other places or buy data. Imagine **buying records over telephone lines** or **dialing up and buying records from your cable TV station where they're going to be sent down coaxial cable**. What this shows is that you can use digital equipment, our equipment, to master—our 2002, our big machine, to master records, make large databases, either on

optical disks or Winchesters, depending on how many of those you want to spin up. Then that database can talk to any local database . . . . So here is your record company, so to speak. You [*sic*] record company becomes an electronic thing with a bunch of data files spun up somewhere. That is talking through a local phone connection through this AT&T Accunet system around the country, to another local phone company, where it either can go to a retailer with a disc copier, . . . or ***direct through a dial-up electronic record store direct to your home*** and dub it through the parallel port.

(A05248, pts. 7-8; A05332-A05333; *see also* A05272-A05282 ¶¶ 32-40.)

As early as the 1984 *Fortune* article, it was appreciated that the same process could be used for both video and audio: "***Movies, which can also be recorded digitally, might be sent the same way.***" (A05247.) Another of the CompuSonics Disclosures explains:

Digital music video distribution offers customers two significant benefits: high fidelity ***digital audio and video***, and convenient purchasing via electronic distribution directly to the home.

The proposed music video distribution chain has three principle components that depend on CSX technology: a video database computer, a broadcast digital encoder, and a home disk-based digital video decoder/recorder. ***A consumer enjoying music television who chooses to purchase his own digital copy calls the distributor with his request. The distributor enables the video database computer to access the consumer's selection and transfer the video/audio data to the broadcast digital encoder. This encoder modulates the data onto a cable television subcarrier or other transmission format. The home decoder/recorder receives the digital video/audio data over the cable link and copies it to disk.***

(A05212-A05213.) And the patent the PTO granted to Mr. Schwartz for the CompuSonics DSP—U.S. Patent No. 4,682,248 (the "CompuSonics Patent")—

describes devices for converting analog audio and/or video signals into digital form and electronically transmitting signals. (*See* A05215 at Abstract, A05235 col.3 ll.44-50, A05236 col.5 ll.52-58, A05240 col.14 ll.31-47, A05241 col.15 ll.11-41.)

## II.   SightSound's Patents

*After* the CompuSonics Disclosures publicly disclosed ways in which CompuSonics' telerecording process and DSPs could be used to electronically sell and distribute digital audio and video, SightSound filed the applications that resulted in the two patents that are the subject of this appeal. These patents are directed broadly to the same concept of "electronic sales and distribution of digital audio or video signals." (A00294 col.1 ll.9-14; A00379 col.1 ll.17-18) To perform this financial transaction, the patents disclose a preferred embodiment that employs "commercially available" components, such as a hard disk, telephone lines, a compact disk player, and a video display unit. (A00295 col.4 ll.16-20; A00380 col.4 ll.33-37.)

Each of the challenged claims requires: (1) *forming a connection*, through telecommunications lines, between a first party's first memory and a second party's second memory; (2) *selling* the desired digital video or digital audio signals to the second party for a fee through telecommunications lines; (3) *transmitting* the desired signals from the first memory to the second memory via telecommunications lines; and (4) *storing* the transferred signals in the second

memory.  On appeal, SightSound argues only that the CompuSonics Disclosures do not teach the claimed "second memory" or, in some claims, "second party hard disk."

## III.  Procedural Background

In 2011, SightSound filed a complaint in the Western District of Pennsylvania, alleging that Apple was infringing 84 claims of three patents: the '573 Patent, the '440 Patent, and another related patent, U.S. Patent No. 5,675,734. After the district court issued its February 13, 2013 claim construction order, only seven method claims remained asserted—four from the '573 Patent and three from the '440 Patent.

On May 6, 2013, Apple filed petitions for covered business method review of these remaining seven claims.[3]   Apple asserted that the CompuSonics Disclosures collectively disclose each and every limitation of these challenged claims. (*See generally, e.g.*, A00449-A00470; A00881-A00903.)  Apple explained

---

[3]     In addition to the two petitions that led to the instant appeal, Apple filed two petitions—one for each of the '573 and '440 Patents—challenging the validity of these same remaining seven claims under § 101 for failure to claim anything more than the abstract idea of electronically selling digital signals. *See Apple Inc. v. SightSound Techs., LLC*, No. CBM2013-00019, 2013 WL 8538867, at *10-13 (P.T.A.B. Oct. 8, 2013); *Apple Inc. v. SightSound Techs., LLC*, No. CBM2013-00021, 2013 WL 8538869, at *11-14 (P.T.A.B. Oct. 8, 2013).  Those petitions, and the Board's decisions declining to institute CBMR proceedings on them, pre-dated the Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), and this Court's decisions applying *Alice*, such as *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713-17 (Fed. Cir. 2014) and *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352-55 (Fed. Cir. 2014).

that the CompuSonics Disclosures collectively teach "[t]he technology and concepts embodied in CompuSonics' publicly disclosed system" and, for each limitation, identified which of the CompuSonics Disclosures taught that limitation. (A00449, A00459-A00470; A00881, A00889-A00903.)  As Mr. Schwartz stated in his declarations, each of the CompuSonics Disclosures "is a public disclosure of features of the CompuSonics system" and the CompuSonics Disclosures "***individually and collectively*** describe functionality and application of the CompuSonics system."  (A12707 ¶ 5; A13241 ¶ 5.)

The Board issued Decisions on Institution that instituted CBMR proceedings, finding it was more likely than not that the challenged claims were anticipated and rendered obvious by the CompuSonics Disclosures.  (A00566-A00571; A00999-A01003.)

## A.    The Board Proceedings

After the CBMR proceedings were instituted, and before filing its Patent Owner Responses, SightSound noticed and took the depositions of Mr. Schwartz and Apple's technical expert, Dr. John Kelly.  Thereafter, SightSound addressed in its Responses both the anticipation and obviousness grounds of institution based on the CompuSonics Disclosures.  SightSound argued the claimed "second memory" is limited to "non-removable" media or "hard disk."  (A00611-A00612; A01045.) SightSound also argued that "[n]one of the CompuSonics Exhibits, ***alone or in***

*combination*, disclose the claimed method" and that secondary considerations support nonobviousness. (A00647; A01077; *see generally* A00651-A00665; A01081-A01095.) SightSound further argued that, under 37 C.F.R. § 42.208(c), the Board should not have initiated review on § 103 grounds. (A00641-A00644; A01071-A01073.)

The Board held a combined hearing for both CBMR proceedings on May 6, 2014. At the hearing, SightSound argued it had not had a fair opportunity to respond to the obviousness grounds on which the CBMR proceedings were instituted. The Board granted SightSound additional time for a "brief summation" after Apple's rebuttal case—time which SightSound used to address both Apple's anticipation and obviousness arguments. (A01238-A01242 at 98:22-102:5.) In addition, the Board authorized SightSound to file sur-replies and new declaration testimony, if necessary, on the issue of obviousness over the CompuSonics Disclosures "to ensure that Patent Owner has a full and fair opportunity to be heard on the issue of obviousness." (A00709; A01138.) SightSound filed a 15-page sur-reply in each of the proceedings addressing the instituted grounds of obviousness. (*See* A00814-A00832; A01243-A01261.) Apple had no opportunity to respond to SightSound's sur-replies.

### B.    The Board's Final Written Decisions

On October 7, 2014, the Board issued a Final Written Decision in each of the CBMR proceedings.  (A00001-A00068; A00069-A00134.)  The Board, *inter alia*, confirmed that the term "second memory" is not limited to non-removable media (A00009-A00015; A00078-A00082); confirmed that it could review whether the claims were obvious (A00025-A00027; A00092-A00094); and determined that the challenged claims would have been obvious in light of the CompuSonics Disclosures, including finding that they expressly or inherently taught each and every limitation of the challenged claims, that a POSITA would have been motivated to combine the CompuSonics Disclosures, and that SightSound had failed to prove that secondary considerations show nonobviousness (A00027-A00059; A00094-A00126).

### 1.    *The Board's Construction Of "Second Memory"*

The Board first construed the term "second memory," which appears in each of the challenged claims.  (A00009-A00015; A00078-A00082).  Independent claims 1 and 4 of the '573 Patent recite, *inter alia*, transferring money electronically from a "second party controlling use and in possession of [a] second memory" and "storing [a] digital signal in the second memory."  (A00009; A00296 col.6 ll.8-23, col.6 ll.40-55.)  Claim 1 of the '440 Patent recites, *inter alia*, transferring a digital video or audio signal "to [a] second memory of . . . [a] second

party" and "storing the desired digital video or digital audio signals in a non-volatile storage portion of the second memory . . . wherein the non-volatile storage portion is not a tape or CD." (A00073-A00074; A00403 col.1 ll.50-64.) And claims 64 and 95 of the '440 Patent recite, *inter alia*, "[a] second memory including a second party hard disk," transferring digital video or audio signals to the second memory, and "storing the desired digital video or digital audio signals in the second party hard disk." (A00078; A00406 col.8 ll.16-44, A00409 col.13 ll.18-51.)

SightSound argued that, for each challenged claim, "the 'only reasonable interpretation . . . is that the claims require a hard disk for storage, not a removable medium.'" (A00009-A00010 (quoting A00611-A00612); A00078 (quoting A01043-A01047, A01095).) The Board rejected this argument for independent claims 1 and 4 of the '573 Patent and independent claim 1 of the '440 Patent, noting that claims 64 and 95 of the '440 Patent "recite expressly a 'second memory including a second party hard disk.'" (A00009-A00010; A00078.) For the term "second memory," the Board explained that neither party "dispute[d] that the ordinary and customary meaning of 'memory' does *not* require a hard disk or that the device be non-removable," and then found that "the ordinary meaning of 'second memory' is a second storage space in a computer system or medium that is

capable of retaining data or instructions." (A00010; A00079 (emphasis in original).)

The Board disagreed with SightSound's arguments that (1) the specifications disclaim the ordinary meaning of "memory," and (2) "second memory" means "a non-volatile form of memory that is not a tape, CD or other similar removable media" (A0009-A00012; A00078-A00081.) The Board explained that the specifications describe the use of a hard disk in only a preferred embodiment, (A00011 (citing, *e.g.*, A00295 col.3 ll.42-57, A00296 col.5 ll.61-67); A00080 (citing, *e.g.*, A00380 col.3 l.55-col.4 l.28, A00381 col.6 ll.10-16)), and does not limit the "second memory" to only non-removable devices. (A00011-A00012; A00080-A00081.) The Board noted that "[t]he Specification does not use the term 'removable' or state that any memory must be incapable of being removed." (*Id.*) The Board further explained that "[t]he Specification does not indicate that the identified disadvantages [(of records, tapes, and CDs)] extend to all removable media or that the disadvantages occur specifically because the devices are removable." (A00012 (citing A00294 col.1 l.17-col.2 l.9); A00081 (citing A00379 col.1 l.24-col.2 l.21).) The Board also noted that even SightSound's expert, Mr. Snell, agreed that "hard disks . . . were available at the time of the '573 patent as removable and non-removable devices." (A00012 (citing A05445-A05446 at 107:20-108:2); A00081 (same).) Furthermore, the Board rejected SightSound's

argument that *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012) supported disclaimer, explaining that the case is distinguishable because neither the claims nor the specifications here suggest that the second memory must be "non-removable." (A00012-A00013; A00081-A00082.)  Additionally, the Board noted that, due to claim differentiation, the term "second memory" itself could not be limited to require a non-removable hard disk because some claims of the '440 Patent explicitly recite a "hard disk" (*e.g.*, claims 10, 64, and 95), whereas others (*e.g.*, claim 1) do not.  (A00079.)

For the challenged claims of the '573 Patent, the Board also rejected SightSound's argument that the *ex parte* reexamination history for the '573 Patent shows that "second memory" means "non-volatile storage that is not a tape, CD, or removable media." (A00013.)  Specifically, there, the patentee had attempted to amend claims 1 and 4 to recite "storing the digital signal in a non-volatile storage portion of the second memory, wherein the non-volatile storage portion is not a tape or a CD." (*Id.* (quoting A04297-A04298).)  However, the '573 Patent expired during reexamination, rendering the patentee unable to amend the claims.  (*Id.*)  The Board noted that the examiner ultimately allowed the claims and interpreted the second memory as "*not* including cassette tapes, CDs and the like." (A00013-14 (quoting A05168) (emphasis in original).)

The Board, however, was "not persuaded that the [reexamination] prosecution history demonstrates a clear and unmistakable disclaimer of all removable media" because the statements during reexamination only "pertain[ed] to specific hardware devices—records, tapes, and CDs—and are not tied explicitly to all removable media." (A00014.) Accordingly, the Board found that, "[a]t most, the patentee's statements may be read as disclaiming records, tapes, and CDs, but may not be read as disclaiming all removable media as SightSound contends." (*Id*.)

Furthermore, for the challenged claims of the '573 Patent, the Board noted that statements made during original prosecution by the named inventor, Mr. Hair, "contradict[ed] SightSound's proposed interpretation," because he stated that "any suitable recording apparatus controlled and in possession of the second party can be used to record the incoming digital signals." (*Id*. (quoting A12333).) And, in the original claims as drafted, the applicant expressly recited a "hard disk" but later replaced that language with the broader term "second memory." (A00015 (citing A12211).) Accordingly, the Board interpreted "second memory" "according to its ordinary meaning to mean a second storage space in a computer system or medium that is capable of retaining data or instructions." (A00015; A00082.)

### 2.    *The Board's Confirmation Of Its Jurisdiction*

The Board ruled that it had authority to institute CBMR proceedings on the grounds of obviousness over the CompuSonics Disclosures.  (A00025-A00027; A00092-A00094.)   The Board determined that Apple's petitions had, in fact, "supported a ground of obviousness based on the CompuSonics publications." (A00026   (citing   A00570-A00571);   A00093   (citing   A01002-A01003).) Specifically, "Apple explained in detail in its Petition[s] how the publications teach every limitation of the claims, and how the publications describe similar features and relate to each other," and that "[t]he allegations in the Petition[s] were supported by the declarations of Mr. Schwartz, who testified that the CompuSonics publications were disclosed publicly, and Dr. Kelly, who testified regarding how the CompuSonics publications teach every limitation of the challenged claims." (A00026 (citing A00449-A00471; A05272-A05282 ¶¶ 32-40, A05287 ¶ 47, A005297-A05309; A12707-A12711 ¶¶ 5-14, 16, 17, 19); A00093 (citing A00881-A00903; A09494-A09503 ¶¶ 32-40, A09508 ¶ 47, A09518-A09534; A13241-A13245 ¶¶ 5-14, 16, 17, 19).)

Finally, the Board rejected SightSound's due process complaint, explaining that the petitions supported obviousness grounds, the Decisions on Institution explained the basis for the obviousness institution, and SightSound was permitted

sur-replies and new declaration testimony in response to Apple's replies. (A00027; A00094.)

        3.    *The Board's Decision On Obviousness*

        (a)    <u>The Teachings of the CompuSonics Disclosures</u>

The Board found that the CompuSonics publications teach each and every limitation of the challenged claims, noting that "Apple explains in detail in its Petition[s] how the CompuSonics publications teach every limitation of [each challenged claim], relying on the testimony of Dr. Kelly in support." (A00031-A00037; A00098-A00104; *see* A00054-A00059; A00121-A00123.) In particular, the Board recognized that "there is no dispute that all of the physical components recited in the claimed methods . . . were known in the prior art." (A00031-A00032; A00098-A00099.) And the Board found that the CompuSonics Disclosures teach storing signals in the claimed "second memory" for claims 1 and 4 of the '573 Patent and claim 1 of the '440 Patent because, among other reasons, they describe storage on a floppy disk, which meets the properly construed limitation. (A00031-A00032; A00098-A00100.) In doing so, the Board noted that SightSound's argument that the CompuSonics Disclosures do not disclose the claimed "second memory" was based on SightSound's erroneous claim construction of "second memory," which the Board rejected. (A00031-A00032; A00098-A00099.) For claims 64 and 95 of the '440 Patent, which expressly recite

a hard disk, the Board found that "the CompuSonics publications generally describe using a hard disk (as well as a floppy disk) for storing digital video or digital audio signals."  (A00122-A00123; *see* A09468; A09462 col.14 ll.31-40; A09433-A09434.)

The Board also found that the CompuSonics Disclosures teach the claimed "transferring money electronically"/"selling electronically" steps.  (A00033-A00036; A00100-A00104.)  SightSound does not dispute this finding.

### (b)    Motivation to Combine

The Board found that a POSITA would have been motivated to combine the CompuSonics Disclosures.  The Board found that the CompuSonics Disclosures "certainly have interrelated teachings, as all of the publications describe technology developed by the same company (CompuSonics), use similar terminology, and pertain generally to the recording of digital audio or video." (A00042; A00109.)  In view of this, the Board determined that "a person of ordinary skill in the art would have considered the publications collectively to achieve a system for selling music electronically, as expressly contemplated by the references."  (A00042; A00109, A00123-A00125.)

More generally, the Board found that "the references expressly contemplate that it would be commercially desirable to have a system that allowed users to buy music electronically."    (A00039-A00040 (citing  A05246-A05247;  A05212;

-20-

A05197; A05209; A05190; A05195; A05208); A00106-A00107 (same).)  Thus, the Board found, "the references themselves demonstrate that a person of ordinary skill in the art would have been led to create a system for users to purchase and download music."  (A00040 (citing *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000)); A00107 (same).)  And the Board found that the CompuSonics Disclosures do not teach away from use of a hard disk.  (A00040-A00041; A00108, A00125.)  Indeed, the Board found that the CompuSonics Disclosures "describe prior art elements operating according to their known functions and yielding predictable results," which would have achieved a "system that allowed users to purchase and download music, as expressly contemplated by the references themselves."  (A00037-A00038; A00105.)

(c)    Secondary Considerations

Finally, the Board rejected SightSound's secondary considerations arguments, including, *inter alia*, SightSound's contentions of commercial success based on Apple's iTunes Music Store ("iTMS").  As to SightSound's broad allegation that the claims are "coextensive with both digital downloads generally to non-removable media and sales of audio and video content from the iTMS," the Board correctly explained that "the issue is whether the claims are coextensive with the specific iTMS product alleged to be successful, not whether the claims are coextensive with digital downloads 'generally' as SightSound suggests."

-21-

(A00044-A00045; A00111-A00112 (citations omitted).)  The Board further found that "the iTMS is a complex computer system embodying numerous inventions." (A00045; A00112.)  The Board credited Apple's witnesses, including Mr. Robbin, who helped develop iTMS, on this point, and, in contrast, found "Mr. Snell's analysis [to be] of limited probative value because, although he explains why he believes that the iTMS *practices* the claimed methods, he does not explain in any detail why they allegedly are *coextensive* with each other."  (A00045-A00046; A00112-A00113 (emphases in original).)

Further, the Board found that SightSound failed to prove any nexus, as required for showing commercial success.  Specifically, the Board found that "[t]he fact that customers decide to buy music and video through the iTMS is the alleged commercial success itself, not a connection between such success and any claimed features."  (A00047; A00114.)  The Board also found Apple's witness testimony more persuasive than Mr. Snell's on the issue of alleged commercial success.  For example, the Board credited the testimony of Mr. Kenswil—a former employee of the Universal Music Group and board member of the Recording Industry Association of America with over 25 years of experience—who explained that numerous unclaimed factors—such as content selection and user interface— accounted for the iTMS's success.  (A00047 (citing A05610-A05614 ¶¶ 5-18, A05633-A05646 ¶¶ 66-98); A00114-A00115 (citing A09841-A09845 ¶¶ 5-18,

A09864-A09877 ¶¶ 66-98.)   The Board found the iTMS gained success by, for

example, offering a full catalog of content by "alleviat[ing] record label concerns

over piracy and copyright protection, thereby ensuring that Apple would be able to

offer a wide selection of content on the iTMS," and by having a user interface with

features such as "'the five-star rating system, lists of music videos by the band

being viewed, lists of movies and books about the band being viewed, concert tour

information for the band being viewed, the "genius" recommendation feature, and

the song-by-song "Popularity" rating.'"   (A00047-A00048; A00115-A00116

(citations omitted).)   By contrast, the Board did not find persuasive Mr. Snell's

testimony on these commercial issues, given that "his 'expertise is in the

engineering and the computer side,' not in sales."   (A00049 (citing A05551-

A05552 at 213:24–214:14); A00116 (same).)   Rather, "[g]iven Mr. Kenswil's

lengthy background in the music industry and testimony regarding specific features

of the iTMS user interface, [the Board found] his testimony regarding the causes of

the iTMS's commercial success to be more convincing."   (A00049; A00116)

Accordingly, the Board found that "the commercial success of the iTMS does not

support a conclusion of nonobviousness." (A00050; A00117.)

### 4.     *The Board's Decision On Anticipation*

Although the Board determined, as summarized above, that all limitations of

the challenged claims were disclosed by the CompuSonics Disclosures, the Board

nonetheless decided not to invalidate the claims based on the instituted grounds of anticipation. Apple contended that the challenged claims were anticipated under § 102(a) by public knowledge of how the CompuSonics' telerecording process and DSPs could be used for electronic sales and distribution of digital audio and video, as shown collectively by the CompuSonics Disclosures. (*See* A00023-A00024; A00090-A00091.) The Board agreed that those publications—all of which disclosed how existing CompuSonics products could be used—did disclose all of the claim limitations, but the Board found that the CompuSonics Disclosures "describ[e] a family of device models, as opposed to a single device model" (A00024; A00091) and therefore do not "disclose a single, publicly known system that anticipates the challenged claims." (A00023; A00090.)

## SUMMARY OF THE ARGUMENT

This appeal relates to seven challenged method claims—claims 1, 2, 4, and 5 of the '573 Patent and claims 1, 64 and 95 of the '440 Patent—which the Board properly invalidated under 35 U.S.C. § 103(a).

SightSound does not dispute that the CompuSonics Disclosures, taken together, disclose the electronic sale of digital audio/video data, as broadly claimed by SightSound. Indeed, SightSound admits its patents disclose conventional computer components used for nothing other than their well-established, predictable purposes. (A00649; A01079.)

On the merits, SightSound challenges only (a) whether the CompuSonics Disclosures disclose or render obvious "non-removable" media—a limitation that does not appear in any claim; (b) whether a POSITA would be motivated to combine the CompuSonics Disclosures, which all describe CompuSonics' technology, including how it can be used to facilitate electronic sale, transmission, and storage of digital audio and video; and (c) whether nonobviousness is demonstrated by secondary considerations.

As detailed below, the Board's interpretation of the "second memory" limitation of the challenged claims is supported by the patents and their prosecution and reexamination histories, as well as by the Board's factual findings regarding the state of the art. The Board's factual findings regarding the

-25-

CompuSonics Disclosures' disclosure of the "second memory" and "second party hard disk" limitations are supported by substantial evidence. And the Board's factual findings and credibility determinations rejecting SightSound's commercial success theory are supported by substantial evidence and are within the discretion of the Board.

Lacking further substantive arguments, SightSound attempts to shift this Court's focus away from the Board's obviousness determinations, and to direct it instead towards what SightSound characterizes as "jurisdictional" issues. More specifically, SightSound offers several challenges to the Board's institution decisions. But as this Court confirmed recently in *In re Cuozzo Speed Technologies, LLC*, 778 F.3d 1271 (Fed. Cir. 2015), the AIA bars review of SightSound's challenges to the Board's Decisions on Institution, notwithstanding SightSound's characterization of them as "jurisdictional." Both the Board's decision to institute the CBMR proceedings on obviousness grounds and its finding that the patents-in-suit are covered business method patents were part of its institution decisions, which are "final and nonappealable" under 35 U.S.C. § 324(e). And, even were the institution decisions reviewable, SightSound's arguments would lack merit because the Board correctly found that Apple's CBM petitions fully supported the instituted grounds of obviousness and that the patents-

in-suit claim methods "used in the practice, administration, or management of a financial product or service" under AIA § 18(d)(1).

Finally, though this Court need not reach this issue because it should affirm the Board's obviousness determinations, the Court can affirm the invalidity of the challenged claims based on the alternative ground of anticipation. Although the Board found that the CompuSonics Disclosures "describ[e] a family of device models, as opposed to a single device model" (A00024; A00091), § 102(a) requires only that the claimed *method* was publicly known. Here, the Board correctly found that the CompuSonics Disclosures teach each and every limitation of the challenged method claims.

ARGUMENT

## I.    Standard of Review

The review standards set forth in the Administrative Procedure Act ("APA") apply to the Board's actions. *See, e.g.*, *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999); *In re Sullivan*, 498 F.3d 1344, 1346 (Fed. Cir. 2004). The Board's conclusion on obviousness is a legal conclusion based on underlying factual findings. *See, e.g.*, *Cuozzo*, 778 F.3d at 1283. This Court reviews the Board's legal conclusion of obviousness *de novo* and the Board's underlying factual findings for substantial evidence. *See, e.g.*, *id.*; *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); 5 U.S.C. § 706. Thus, as SightSound acknowledges, the

Board's factual findings—including its findings on the scope and content of the prior art, level of ordinary skill in the art, the differences between the claimed invention and the prior art, motivation to combine, and objective evidence of nonobviousness—must be sustained so long as they are based on substantial evidence. *Gartside*, 203 F.3d at 1311-13, 1319-20; *see Zurko*, 527 U.S. at 164. Substantial evidence is "more than a mere scintilla of evidence but something less than the weight of the evidence." *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (citations and internal quotation marks omitted).

On issues of claim construction, this Court reviews any underlying factual determinations concerning extrinsic evidence for substantial evidence and the ultimate construction *de novo*. *Cuozzo*, 778 F.3d at 1283.

The Board's decision to institute CBMR proceedings is not subject to appellate review. 35 U.S.C. § 324(e) ("No Appeal.—The determination by the Director whether to institute a post-grant review [or CBMR] under this section shall be final and nonappealable."); *see also Cuozzo*, 778 F.3d at 1276-77.

## II.    The Board Correctly Concluded That Claims 1, 2, 4, and 5 Of The '573 Patent And Claims 1, 64 And 95 Of The '440 Patent Are Obvious

As the Board correctly concluded, the CompuSonics Disclosures, taken together, render obvious each of the challenged claims of the '573 and '440 Patents. Indeed, SightSound disputes only the Board's determinations that (1) the "second memory" or "second party hard disk" limitation of each claim is disclosed

or rendered obvious, (2) a POSITA would, in fact, have been motivated to combine the CompuSonics Disclosures, and (3) the commercial success of Apple's iTMS does not require a conclusion of nonobviousness.

### A.    Legal Standards—Obviousness, Motivation To Combine, Secondary Considerations

A claim is obvious in view of the prior art if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a).  "What matters is the objective reach of the claim.  If the claim extends to what is obvious, it is invalid under § 103."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007).  "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art."  *Id.* at 420. "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *Id.* at 421.

In considering obviousness over a combination of references, a court must determine whether a POSITA "would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so."  *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).  To answer this question, courts may "look to interrelated teachings of multiple

[references]; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art . . . to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418.

As to commercial success, "[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer "proof that the sales [of the product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). In addition, "if the commercial success is due to an unclaimed feature of the device," or "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006); *see also In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011) (requiring a determination of

"whether the commercial success of the embodying product resulted from the merits of the claimed invention as opposed to the prior art or other extrinsic factors").

### B. The Board Correctly Found That The CompuSonics Disclosures Disclose The "Second Memory" And "Second Party Hard Disk" Limitations Of The Challenged Claims

The teachings of the patents are focused on the electronic sale and distribution of digital signals, not on the type of media used to store the digital signals, once received. As detailed below, the Board correctly determined that the term "second memory," which appears in all of the independent challenged claims, is not limited to non-removable media and that the CompuSonics Disclosures disclose the "second memory" and "second party hard disk" limitations. In any event, even if the "second memory" were limited to non-removable media (it is not), the CompuSonics Disclosures teach that as well.

Over the course of two district court *Markman* proceedings spanning over 10 years, including in its case against Apple, SightSound never argued that the challenged claims were limited to using non-removable media. Nor did SightSound argue that it had disavowed any claim scope. (A12727-A12752; A12754.)

During the CBMR proceedings, however, SightSound for the first time argued that the claimed "second memory" is limited to non-removable media

and/or hard disk.  (A00611-A00612; A01045.)  But, at the hearing, when asked by the Board for SightSound's exact proposed interpretation of "second memory," SightSound retreated from limiting "second memory" to a hard disk and instead responded that "second memory" was limited to non-removable media, such as internal hard drives and solid state memory.  (A01188 at 48:1-16.)  The Board correctly determined that the patents' claims are not so limited.

### 1.   *The Board Correctly Determined That "Second Memory" Is Not Limited To Non-Removable Media*

The Board properly found that neither the specifications nor the prosecution histories of the '573 and '440 Patents demonstrate a clear and unmistakable disclaimer of all removable media from the claimed "second memory," as SightSound urges.  (A00015; A00082.)  Therefore, the Board's construction of second memory according to its ordinary meaning as "a second storage space in a computer system or medium that is capable of retaining data or instructions" is correct and should be affirmed.  (*Id.*)

"The standard for disavowal of claim scope is . . . exacting."  *Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  "[T]o disavow claim scope, '[t]he patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'"  *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed.

Cir. 2012) (citation omitted).    "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366.

Here, the Board correctly found that SightSound did not meet the high standard required for disavowal.  (A00015; A00082.)  Indeed, as SightSound's counsel admitted, the patents' specifications do not even use the term "removable media."  (A01181 at 41:6-9).  Rather, the patents' specifications identify certain disadvantages associated with ***distributing*** content on three specific types of media or "hardware units": records, tapes, and compact discs.  (A00294 col.1 ll.17-18; A00379 col.1 ll.24-26.)  The specifications do not state that the disadvantages of those three specific hardware units are common to all removable media or are a result of their removable nature.  (A00012; A00081.)  Indeed, the Board observed that "some of the identified disadvantages, like limited capacity and playback capability, have nothing to do with whether the device can be removed." (*Id.*)  The patents' objective was not, as SightSound contends, to overcome the alleged disadvantages associated with the removable nature of the three hardware units, but to overcome the disadvantages with the traditional model of recording music/video onto hardware units and then distributing those hardware units through brick-and-mortar stores:

> SALES AND DISTRIBUTION: Prior to final purchase, ***hardware units need to be physically transferred from the manufacturing***

-33-

> *facility to the wholesale warehouse to the retail warehouse to the*
> *retail outlet*, resulting in ***lengthy, lag time*** between music creation and
> music marketing, as well as incurring ***unnecessary and inefficient***
> ***transfer and handling costs***. Additionally, tooling costs required for
> mass production of the hardware units and the material cost of the
> hardware units themselves, further drives up the cost of music to the
> end user.

(A00294 col.1 ll.39-49; A00379 col.1 ll.45-54.)

Accordingly, a stated objective of the patents was "to provide a new and improved methodology/system to electronically sell and distribute Digital Audio Music." (A00294 col.2 ll.10-12; A00379 col.2 ll.26-28.) And, in its technology tutorial for the district court litigation, SightSound depicted the advantages of the electronic distribution model of its patents over the traditional model:





(A13201-A13202.)     Similarly, at the Board hearing, SightSound's counsel explained:

> Prior to 1988, . . . the market was dominated by conventional consumer electronics which had CDs, records, with the distribution and the like of that occurred. All of this had to be manufactured in warehouses, shipped to retail locations, and ultimately sold to the consumer who had to store and handle their collections of records, CDs and the like. If you wanted to play different songs from different CDs, you had to switch out your hardware. And Mr. Hair conceived of a truly innovative way to commercially deliver music and movies to consumers that was new in light of the then-distribution system. . . .
>
> His invention transmitted digital systems to the computers of consumers, and completely broke the mold where content was fused with physical items like an album, a CD, or the like. His invention eliminated the inefficiencies of then-model and provided consumers with the ultimate convenience of purchasing their music and movies without leaving their home, with a few keystrokes.

(A01170-A01171 at 30:10-31:1.)  The removability of the hardware units was of no consequence to the claimed invention.[4]  Indeed, SightSound itself encouraged its customers to store music purchased from its embodying website on removable optical memory.  (A13192, A13197; A05482-A05484 at 144:7-146:12; A05657-A05658 ¶ 11; A09889-A09890 ¶ 11.)

Nonetheless, SightSound argues that "[b]ecause a 'hard disk' is included in *every disclosed embodiment*, non-removable memory . . . is crucial to effectuating the avowed purpose of the invention."  (Appellant's Br. at 48 (emphasis in original).)  But as the Board correctly found, the "Specification[s] describe[] the use of a hard disk in the context of describing a preferred embodiment, not defining the 'second memory' recited in the claims."  (A00011; A00080.)  This Court has cautioned that claim terms should not be limited to the embodiments in the specification.  *Aventis Pharma*, 675 F.3d at 1330-31.  Moreover, claims 64 and 95 of the '440 Patent claim a "second party hard disk"—a specific type of memory—as a subset of "second memory."  (A00406, A00409 ("the second memory including a second party hard disk").)  It is black letter law that the other challenged claims, which do not contain such a limitation, are thus not limited to a

---

[4]    For the same reasons, *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142 (Fed. Cir. 2012), on which SightSound relies, is inapposite.  As SightSound explained, there "the purpose of the invention was to overcome [the disparaged] feature or aspect."  (Appellant's Br. at 49.)  Here, the patents' specifications do not even mention removability, let alone show that the purpose of the invention was to overcome it.

"hard disk." *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1330-31, 1335 (Fed. Cir. 2004) (claims not limited where limitation appears in other claims but not in claims at issue); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254-55 (Fed. Cir. 2011) (reading a limitation that appears in only some claims into claim term "would render these additional modifiers superfluous, which weighs against doing so."). In any event, as the Board found as a matter of fact (and as SightSound admitted), at the time of the patents "hard disks" were available as both removable and non-removable devices. (A00012; A00081; A05445-A05446 at 107:20-108:2.) Thus, the inclusion of a "hard disk" in each of the patents' disclosed embodiments neither necessitates nor makes appropriate limiting the claims to non-removable memory.

The prosecution history also does not support SightSound's claim of disavowal. Although the patentee argued during prosecution that records, tapes, and CDs are deficient "in light of their removable nature and their physical distribution (when compared with a hard disk acting as an internal, non-volatile storage device)" (A05112-A05113), the prior art the patentee was trying to overcome included storage on cassette tapes and CDs only, as admitted by SightSound's counsel. (A01186 at 46:1-5.) No other storage—removable or otherwise—was discussed or distinguished. As the Board pointed out, "[t]he fact that tapes and CDs have the common attribute of being removable (in addition to

-37-

many other attributes) does not mean that the patentee was disclaiming all removable devices." (A00014.) Further, during reexamination of the '573 Patent, the patentee attempted to amend certain claims to exclude *tapes and CDs only*— not all removable memory. (A04297-A04298 ("storing the digital signal in *a non-volatile storage portion of* the second memory, *wherein the non-volatile storage portion is not a tape or a CD*.") (added language in emphasis).) Though the patentee's proposed amendment was removed from consideration because the '573 Patent expired (A05085-A05086), the Examiner stated that "the original claims have essentially the same scope as the amended, <u>original</u> claims did." (A05168 (emphasis in original).) That is, as the Board concluded, "[a]t most, the patentee's statements may be read as disclaiming records, tapes, and CDs, but may not be read as disclaiming all removable media as SightSound contends." (A00014.)

The Board's construction of "second memory" is, therefore, correct and should be affirmed.

> 2. *The Board Correctly Found That The CompuSonics Disclosures Disclose A "Second Memory"*

SightSound does not dispute that the CompuSonics Disclosures disclose the storage of received digital signals in removable memory, including at least floppy and optical disks. (Appellant's Br. at 61.) Accordingly, SightSound has waived any possible challenge to the Board's correct conclusion that the CompuSonics

Disclosures disclose a "second memory," as that term is properly construed. (A00032; A00099-A00100.)

But even if SightSound's claim construction argument were accepted, the Board's obviousness holding should still be affirmed. Contrary to SightSound's assertion that CompuSonics never contemplated the use of non-removable memory to store transmitted digital signals because CompuSonics considered non-removable memory to be inferior to removable memory (Appellant's Br. at 63-64), the use of both removable and non-removable media were expressly disclosed by the CompuSonics Disclosures. And both types of memory were indisputably well-known in the art. As SightSound acknowledges, the telerecording demonstration between New York City and Chicago used DSP-2002s, which stored transmitted digital signals on internal hard disks. (Appellant's Br. at 15, 17; A01158 at 18:9-18; A12703.) The DSP-2000 model could also be used with a type of hard drive called the "Winchester," which Mr. Schwartz explained can be either removable or non-removable. (A05332; A01958 at 180:20-24.) Furthermore, Mr. Schwartz testified that CompuSonics sold different configurations of CompuSonics' DSP-1000 model series, including some with floppy discs and some with fixed hard drives. (A01951 at 173:14-21.) And the CompuSonics Patent expressly contemplates the use of both removable and non-removable storage of transmitted signals before playback:

> The digital recording and playback system of the present invention for both audio and video recording and playback utilizes *a data storage medium* as previously described *such as flexible or rigid magnetic disks, magneto-optical disks or optical disks*.[5]

(A05240 col.14 ll.31-40.)  All of this evidence is unrebutted.

Contrary to SightSound's present contentions (Appellant's Br. at 61-62), the "problem" purportedly solved by SightSound's patents was not the replacement of one memory type with another for use in storing transmitted signals.  Rather, SightSound described, like CompuSonics had previously, a method for moving away from the traditional model of physically distributing and selling pre-recorded media in favor of digitally selling, transmitting, and storing audio and/or video signals.  (*See* A13201-A13202; A01170-A01171 at 30:10-31:1.)  Further, CompuSonics' intention was not, as SightSound contends, to have pre-recorded floppy disks replace tapes and CDs on the shelves at music retail stores.[6]  Rather,

---

[5]    As discussed at the hearing before the Board, "rigid magnetic disks" are hard disks (A01221 at 81:13-17) and "hard disks" were available as both removable and non-removable devices.  (A00012; A00081; A05445-A05446 at 107:20-108:2.)

[6]    SightSound takes quotes out of context, attempting to confine the CompuSonics Disclosures' discussion of floppy disks to use of floppy disks in a physical distribution model using pre-recorded media.  (Appellant's Br. at 63 n. 17.)  But even a cursory review of those references reveals that CompuSonics was looking toward a digital distribution model for music and video that could then be stored in memory such as the floppy disk.  (*See, e.g.*, A05192-A05196 (noting the DSP-1000's ability to record and store music on floppy disks and that "in the not-too-distant future consumers will be able to buy music at home, over telephone lines or through cable television hookups, and play it back through an audio device resembling a microcomputer."); A05322-A05324 (describing demonstration where audio was sent over telephone line to a DSP-2002 and recorded onto a floppy disk

CompuSonics disclosed that "consumers will be able to buy music at home, over telephone lines or through cable television hookups, and play it back through an audio device resembling a microcomputer." (A05195.) Indeed, CompuSonics' use of floppy disks—among other storage media—to store received audio and video signals is consistent with and supports the same digital distribution model that SightSound's later patents proposed.

3.     *The Board Correctly Found That The CompuSonics Disclosures Disclose A "Second Party Hard Disk"*

As discussed above, substantial evidence supports the Board's findings—in connection with claims 64 and 95 of the '440 Patent—that the CompuSonics Disclosures teach "the use of a hard disk in the DSP-2000 series devices for storing digital audio signals" and that the CompuSonics Patent, in particular, disclosed "the use of any type of data storage medium, such as a floppy disk or hard disk, in the user's device that records and plays back digital video and digital audio signals." (A00122; A05240 col.14 ll.31-40.) Plus, at least one of the models in the CompuSonics' DSP-1000 series included a hard drive (A01555 at 41:4-6; A01951

---

and stating that Mr. Schwartz "visualizes a time when new music will be sent out from recording companies directly to consumers at home, from the phone onto floppy disk, without the need for tapes or vinyl recordings."); A05188-A05190 (describing "electronic record store" concept where "retailers would then be able, in turn, to digitally transmit the music to consumers who would use credit cards to charge their purchases over the phone lines. The final step would involve the CompuSonics consumer digital audio recorder/player (which has yet to see production), which would record the transmission onto a five-and-a-quarter inch 'super-floppy' disk.").)

at 173:14-21) and CompuSonics' DSP-2000 model could be used with a type of hard drive called the "Winchester." (A05332; A01958 at 180:20-24; *see also* A05246 ("CompuSonics has put an hour of music on a hard disk . . . .").)

SightSound's attempt to create a false dichotomy between CompuSonics' so-called "professional"-level devices and "consumer"-level devices is unavailing. (Appellant's Br. at 66-67.) There is no requirement that the claimed "second party" be a non-professional individual "consumer."[7] The "second party" could be a professional or retailer that uses the professional version of a CompuSonics DSP, which SightSound admits had a hard drive. (A00649 ("CompuSonics taught the use of a hard disk for an 'electronic record store,' . . . ."); A01079-A01080; A01189 at 49:6-10 ("[A]t least some of the DSP-2000s have a hard drive and a floppy disk.").) And the CompuSonics Disclosures disclose that retailers can use the professional device to receive music from the record labels and store them on a hard drive. (*See* A05190 ("[S]uch a system . . . would utilize [CompuSonics'] telerecording process and hard disk equipment to allow music software dealers to receive an album master via a digital transmission from the record company.").) Indeed, the telerecording demonstration between New York City and Chicago used

---

[7] Although nothing in the patents or their prosecution histories requires such a reading, SightSound's expert nonetheless maintained that the claimed "second party" must be an individual consumer—even a retailer in a retailer-wholesaler relationship would not, in his view, be considered a "second party." (A05575-A05576 at 237:18-238:2.)

DSP-2002s—a "professional" model with internal hard disks—on both ends of the communication.  (A01158 at 18:9-18; A12703.)  That is, the DSP-2002 on one end transmitted digital music to a second DSP-2002 on the other end, and that music was then stored on the hard disk of the second DSP-2002.  (*Id.*)

Moreover, as SightSound admits, and as evidenced by its use in at least CompuSonics' DSP-2000—a "professional" model—and DSP-1800—a "consumer" model—hard drives were known in the art for storing digital data.  (A01555 at 41:4-10; A01202 at 62:14-16; *see* A00649; A01079 (describing SightSound's patent claims as "prior art elements working according to their established functions and predictability.").)  Using a hard disk instead of a floppy disk to store digital data would have been an obvious design choice.  Indeed, the Board found that the CompuSonics Disclosures "would have suggested to a person of ordinary skill in the art to use a hard disk, rather than a floppy disk, to store digital video or digital audio signals due to the greater storage capacity of a hard disk."  (A00124-A00125 (citing A09468).)  And, even putting to the side the express disclosures of hard disks in CompuSonics' devices, it would have been obvious to a POSITA looking at two models of the same device from the same company—one with a hard disk and one with a floppy disk—to simply swap out the type of memory used on either device with that used on the other.

### C.    The Board Correctly Found That A POSITA Would Have Been Motivated To Combine The CompuSonics Disclosures

A finding of obviousness may be supported by the teachings of multiple references. *KSR*, 550 U.S. at 418. As the Supreme Court held in *KSR*, there is no requirement that the references include a teaching, suggestion, and motivation to combine. *Id.* at 419. Rather, a POSITA will often "be able to fit the teachings of multiple [references] together like pieces of a puzzle." *Id.* at 420. For example, this Court has upheld motivations to combine references when the references are directed to making the same class of products. *In re Hyon*, 679 F.3d 1363, 1366 (Fed. Cir. 2012). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact," reviewed by this Court for substantial evidence. *See Gartside*, 203 F.3d at 1316.

Here, substantial evidence supports the Board's finding that a POSITA would have been motivated to combine the CompuSonics Disclosures. In particular, the Board correctly found that—as common sense dictates—a POSITA would have combined the CompuSonics Disclosures because they "have interrelated teachings" about the use of the same or similar devices (*i.e.*, the CompuSonics DSPs) and "all of the publications describe technology developed by *the same company (CompuSonics)*, use similar terminology, and pertain generally to the recording of digital audio or video." (A00042; A00109); *see In re Mettke*, 570 F.3d 1356, 1359-1361 (Fed. Cir. 2009) (affirming Board's finding of

-44-

motivation to combine where two of three references described products from the same company); *see also KSR*, 550 U.S. at 418 ("Often, it will be necessary for a court to look to interrelated teachings of multiple [references]."). Indeed, SightSound's own expert, Mr. Snell, confirmed it would have been reasonable for a POSITA to combine publications that disclosed how the same system could be used, even if those publications did not explicitly cross-reference one another. (A05588-A05589 at 250:16-251:4 (testifying that one of ordinary skill would have combined publications related to how Lucas Film's Audio Signal Processor system could be used)). Accordingly, substantial evidence supports the Board's finding that a POSITA would have been motivated to combine the CompuSonics Disclosures.

Rather than dispute the substance of this determination, SightSound attempts without success to establish that the Board erred procedurally in reaching the determination. Specifically, SightSound argues the Board improperly "devise[d] its own arguments as to why a person of ordinary skill would have had reason to combine the CompuSonics references," and, in doing so, deprived SightSound of the ability to fully address the issue. (Appellant's Br. at 57.) Not so.

First, SightSound's reliance on this Court's decision in *Rambus Inc. v. Rea*, 731 F.3d 1248 (Fed. Cir. 2013), is misplaced. *Rambus* concerned whether the Board of Patent Appeals and Interferences' ("BPAI") could consider in the context

of an intra-agency appeal an invalidity ground that was not previously considered by the examiner.  This Court held that the BPAI could not do so because its role was limited to "review of the examiner's decisions during prosecution."  *Id.* at 1255.  No such concern exists here because there are no intra-agency appeals in the context of AIA proceedings.  CBMR proceedings are taken up by the Board in the first instance.

Further, SightSound's contention that it was not given fair warning of the Board's alleged "new combination" of CompuSonics Disclosures (Appellant's Br. at 59) lacks any factual basis; that combination is consistent with Apple's treatment of the same references in its petitions and throughout the proceedings. SightSound has been on notice from the outset of Apple's contention that the CompuSonics Disclosures collectively disclose each element of the challenged claims.  And, to ensure that SightSound had an opportunity to be heard, the Board even permitted SightSound to both (1) deliver a "brief summation" at the end of the trial; and (2) file post-trial sur-reply briefs to address this exact issue.  As SightSound acknowledges, it did both.  (Appellant's Br. at 59.)

**D.    The Board Correctly Found That SightSound Failed To Establish That Secondary Considerations Preclude A Finding Of Obviousness**

Commercial success must "result[] from the merits of the claimed invention *as opposed to . . . other extrinsic factors.*"  *In re Kao*, 639 F.3d at 1070.[8]  A patent owner must offer "proof that the sales [of the product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter."  *In re Huang*, 100 F.3d at 140.  In addition, "if the commercial success is due to an unclaimed feature of the device" or "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp.*, 463 F.3d at 1312.

Here, substantial evidence supports the Board's determination that the commercial success of Apple's iTMS does not preclude a finding of obviousness.  SightSound failed to demonstrate that the iTMS practices the claims, let alone make the requisite showings that the alleged claim feature to which it points—non-removable second memory—is both novel and responsible for the success of the iTMS.  Therefore, SightSound cannot demonstrate the requisite nexus between any "novel feature" of the challenged claims and the iTMS.  Nor is nexus presumed

---

[8]    SightSound incorrectly relies on two early district court cases to argue that commercial success due to external factors can nevertheless support a finding of nonobviousness.  (Appellant's Br. at 69.)  This Court's precedent is clear that commercial success must stem from the claimed invention.

because SightSound did not show and provided no support for its single conclusory statement that the iTMS "is co-extensive with the invention disclosed in the SightSound patents." (Appellant's Br. at 13); *Brown & Williamson*, 229 F.3d at 1130. Indeed, the Board was "not persuaded that the iTMS is coextensive with the claims," and found Mr. Snell's analysis of "limited probative value because, although he explains why he believes that the iTMS *practices* the claimed methods, he does not explain in any detail why they allegedly are *coextensive* with each other." (A00046 (emphasis in original); A00113.) As the Board explained, "[t]he two issues are not the same." (A00046; A00113.)

In contrast, the Board found "persuasive" the testimony of Apple's witnesses in "demonstrat[ing] that the iTMS embodies numerous inventions other than the general purchasing and downloading of music relied upon by SightSound." (A00046; A00113.) As noted by SightSound, Apple's expert attributed the value of the iTMS to, among other things, "buying music online," the ability to buy one or two tracks rather than a whole album, and the flexibility of creating playlists. (Appellant's Br. at 72.) These benefits bear no relation to storing content on a non-removable "second memory." Though these benefits may be generally attributable to the electronic sale of digital music and video, the named inventor of SightSound's patents admitted that he did not invent the electronic sale of digital music and video. (A12477-A12478 at 49:3-50:1.) Moreover, even with no nexus

-48-

to rebut, Apple presented evidence that the success of the iTMS is attributable to the many other features contained within the iTMS, such as its content selection, user interface technology, playlist management, presentation of media on a device, secure access to content, and assigning ratings. (A00045; A00113.) Many of these features are themselves covered by patents awarded to Apple, and a number of them issued over SightSound's '573 Patent.[9] (A05606-A05607; A09837-A09838.) The Board correctly credited these numerous features for the success of the iTMS. (A000045-A00050; A00112-A00117.)

SightSound asserts that the failure of its attempted commercialization should be excused because desirable content was not available at the time SightSound tried to commercialize its invention. (Appellant's Br. at 70.) SightSound misses the point. If SightSound's commercial embodiment website and the iTMS both employed the claimed invention, as SightSound contends, but the iTMS succeeded and SightSound did not, then it logically follows that the success of the iTMS was due to something other than the claimed invention.

---

[9] Contrary to SightSound's assertion that "there is no reliable evidence in the record that the inventions disclosed in Apple's patents are part of iTMS," Apple's expert identified over ten patents that, based on his analysis, cover various features of the iTMS. (A05693-A05702 ¶¶ 66-81; A09924-A09932 ¶¶ 67-82.) Further, Jeffrey Robbin, Apple's Vice President responsible for the iTMS, submitted a sworn declaration identifying patents, on which he is a named inventor, that are related to the iTMS. Mr. Robbin confirmed at his deposition that he stands behind everything that was stated in his declaration. (A03286 at 43:3-6.)

SightSound's argument that the Board erred by crediting Apple's reliance on the "Genius" feature of the iTMS because it was introduced after the iTMS's initial success (Appellant's Br. at 70-71) ignores that the iTMS was launched with numerous features that are unrelated to the challenged claims.[10] For example, it is undisputed that at launch the iTMS offered the desirable content that SightSound was unable to obtain. And the Board specifically credited content selection as a factor unrelated to the challenged claims that is attributable to the iTMS's success. (A00047; A00115.) Indeed, SightSound recognized in 1999 that its "success is dependent on its ability to motivate the major owners of video and audio recordings to allow [SightSound] to be a retailer of their content." (A13087-A13088.) A year later, SightSound acknowledged that content was the "key missing ingredient" to the success of its website. (A13116.) Apple was able to achieve what SightSound could not by persuading the major record labels to license their content for the iTMS. (A05634 ¶ 69; A09865 ¶ 69.) In turn, the iTMS succeeded where SightSound's allegedly embodying website failed. Indeed, in addition to SightSound, many other companies who attempted to electronically

---

[10] Moreover, during the CBMR proceedings, SightSound argued that it was the commercial success of the iTMS "in the last decade"—not just at launch—that supported nonobviousness. (A00590 ("[iTMS] is the world's largest seller of digital audio signals, having sold over 25 billion songs in the last decade and currently commanding an 80% market share of the U.S. digital download music market."); A01022; *see also* A00654-A00655 ("Substantially more dollars have been generated from digital downloads compared to streaming subscription services from 2004 through 2012 in the United States."); A01084.)

sell and transmit digital audio have also failed.    (A05617-A05618; A09848-A09849.)

SightSound is left to request that this Court reweigh the evidence.  But the Board properly assigned more weight to Apple's expert, who—as the Board recognized—has a lengthy background in the music industry.  (*See, e.g.*, A00047 ("[W]e have reviewed the testimony of Lawrence Kenswil, a former employee of the Universal Music Group and board member of the Recording Industry Association of America with over 25 years of experience in the music industry, and find it persuasive."); A00114-A00115 (same); A00048 ("We are persuaded by Mr. Kenswil's explanation attributing the success of the iTMS to its content selection."); A00115 (same); A00049 ("Given Mr. Kenswil's lengthy background in the music industry and testimony regarding specific features of the iTMS user interface, we find his testimony regarding the causes of the iTMS's commercial success to be more convincing."); A00116 (same).)  On the other hand, the Board found that SightSound's expert's commercial success analysis fell short.  (*See, e.g.*, A00049 ("Relying on the testimony of Mr. Snell, SightSound asserts that the iTMS user interface cannot be a driver for sales, because (1) the iTMS user interface is 'substantially similar' to the SightSound.com user interface, and (2) the cited features of the iTMS user interface are not specific to purchasing music and video through the iTMS. [A00658-A00659]. Mr. Snell, however, only compared the

SightSound.com website to the iTMS, and did not account for any technical details of the SightSound.com website or address the specific features cited by Mr. Kenswil."); A00116 (same).)   Indeed, the Board noted that SightSound's expert admitted that "his 'expertise is in the engineering and the computer side,' not in sales."    (A00049 (citing A05551-A05552 at 213:14-214:14 ("I'm not a businessperson.  I'm not a financial analyst.  So I think those are questions you want to ask someone who is a financial analyst here . . . . I'm not a sales expert.")); A00116 (same).)  In any event, reweighing the evidence is not a task in which this Court should engage.   *See e.g.*, *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 832 (Fed. Cir. 2010) ("As an appellate court, we cannot reweigh witnesses' credibility.").

## III.    This Court Does Not Have Jurisdiction To Review The Board's Decisions On Institution, Which Were, In Any Event, Correct

Lacking further substantive arguments, SightSound challenges the Board's decision to institute CBMR proceedings in the first instance.  But SightSound's "jurisdictional" attack on the merits of the Board's decisions to institute CBMR is a non-starter.[11]  Both 35 U.S.C. § 324(e) and this Court's recent decision in *In re*

---

[11]    SightSound incorrectly characterizes as "jurisdictional" its attacks on the Board's threshold determination of whether to institute the CBMR proceedings. SightSound's challenges do not go to whether the Board had jurisdiction to institute the CBMR proceedings, but rather to the sufficiency of Apple's petition evidence.  The only jurisdictional question relevant here on appeal is whether this Court can review the Board's institution decision—which, under 35 U.S.C.

-52-

*Cuozzo Speed Technologies, LLC*, 778 F.3d 1271 (Fed. Cir. 2015), make clear that the Board's institution decisions are not subject to appellate review. Accordingly, this Court lacks jurisdiction to hear SightSound's challenges. Because *Cuozzo* issued after SightSound filed its opening brief, presumably SightSound does not intend to maintain its arguments about the alleged reviewability of the Board's Decisions on Institution in light of *Cuozzo*'s resolution of that issue. However, even if the Court were to review the institution decisions, those decisions were correct.

### A.      SightSound's Challenge Is An Impermissible Attack On The Board's Institution Decisions

The Board's determinations that the Petitions supported institution on grounds of obviousness and that the patents are covered business method patents are unreviewable.

Section 324(e) provides as follows:

> No Appeal.— The determination by the Director whether to institute a post-grant review [or CBMR] under this section shall be final and nonappealable.

35 U.S.C. § 324(e). In *Cuozzo*, this Court held that the parallel language of § 314(d), which applies to institution decisions for *inter partes* review (IPR) proceedings, "prohibits review of the decision to institute IPR even after a final

---

§ 324(e) and *Cuozzo*, it cannot. The Supreme Court has cautioned against improperly terming something "jurisdictional" when it is not. *See generally, e.g.*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510-16 (2006).

decision." 778 F.3d at 1276; *id.* at 1277 ("[Section] 314(d) explicitly provides that there is no appeal available of a decision to institute."). The only decision an appellant can appeal is the "final written decision with respect to the patentability of any patent claim challenged by the petitioner." *Id.* at 1276-77 (discussing 35 U.S.C. §§ 141(c), 314(d), 318(a), 319) (citation and internal quotation marks omitted). In *St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, this Court offered the following explanation:

> The statute thus establishes a two-step procedure for *inter partes* review [or CBMR]: the Director's decision whether to institute a proceeding, followed (if the proceeding is instituted) by the Board's conduct of the proceeding and decision with respect to patentability. The statute provides for an appeal to this court only of the Board's decision at the second step, not the Director's decision at the first step.

749 F.3d 1373, 1375-76 (Fed. Cir. 2014) (internal citation omitted); *see also In re Procter & Gamble Co.*, 749 F.3d 1376, 1378-79 (Fed. Cir. 2014) ("[W]e may not hear an appeal from the Director's decision to institute an *inter partes* review."). SightSound is thus statutorily barred from appealing the Board's decisions to institute the CBMR proceedings, which were unquestionably not a "*final written decision with respect to the patentability* of any patent claim challenged." § 328(a).

Nonetheless, SightSound argues it "is not appealing a decision made under Section 324," but rather decisions made "under AIA Section 18 and . . . Section 322." (Appellant's Br. at 45.) And SightSound argues that the "merger rule" should be applied to allow SightSound to appeal the interlocutory Decisions on

Institution. (Appellant's Br. at 43-44.) But these arguments are contradicted by, and must be rejected in light of, the holding in *Cuozzo* that the statute "*prohibits review of the decision to institute* [] even after a final decision." 778 F.3d at 1276. Moreover, unlike the "merger rule" cases SightSound cites, which stand for the unremarkable proposition that *reviewable* interlocutory rulings generally cannot be appealed prior to final judgment, § 324(e) explicitly prohibits review of the interlocutory institution decisions at issue here, even after final judgment. Were the "merger rule" to override § 324(e) here as SightSound urges, it would improperly render the statutory language meaningless. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). The Board's institution decisions are not subject to review.

Where, as here, appeal of the Decisions on Institution is barred by statute, it would be inappropriate to permit SightSound to simply convert its appeal to a petition for mandamus, even if SightSound had made such a request. And it would be too late to seek such relief now in any event, long after the purportedly unauthorized institution and months after *Cuozzo* was decided. But even assuming review by mandamus were not prohibited, *see Cuozzo* 778 F.3d at 1278 (reserving that question), to succeed on the extraordinary relief of mandamus, the petitioner must make three showings:

> First, the party seeking issuance of the writ [must] have no other
> adequate means to attain the relief he desires. . . . Second, the

petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Id*. at 1278 (internal citations and quotation marks omitted). SightSound could not make these showings with respect to either the Board's decision to institute on § 103 grounds or the Board's determination that the challenged patents are amenable to CBMR.

### B. SightSound Has Not Established A Right To Mandamus, Even If Not Precluded By § 324. The Board's Decision To Institute CBMR On Obviousness Grounds Was Proper

As noted above, *Cuozzo* disposes of SightSound's complaint about the Board's decision to institute CBMR on obviousness grounds. Indeed, *Cuozzo* dealt with a scenario strikingly similar to the facts here—the appellant, like SightSound, argued the Board had improperly instituted IPR on grounds that were allegedly not in the petition. This Court held that such a circumstance "*provides no ground for setting aside the final decision.*" *Id*. at 1277.[12] Furthermore, this Court stated that it is "beyond dispute [that] there is no clear and indisputable right that precludes institution" for grounds not "strictly limited to the grounds asserted in the petition." *Id.* at 1278. And SightSound's claim of prejudice is inconsistent with the record, given that SightSound does not and cannot claim that it did not have a chance to

---

[12]    In any event, as discussed *infra*, Apple's petitions supported institution on grounds of obviousness.

fully brief obviousness in light of its initial Response to the Board's institution decisions (which addressed obviousness extensively), the additional argument time it was granted at the oral hearing to address obviousness, and the sur-replies it was granted.    (*See* A01238-A01242 at 98:22-102:5; A00709; A01138.)    That SightSound apparently "used the opportunity to emphasize [] unfairness" (Appellant's Br. at 42), instead of arguing that its alleged inventions actually warrant patent protection, is not a reason to find prejudice here, and it certainly does not show a clear and indisputable right to the relief requested.

In any event, as the Board correctly found, Apple's petitions *did* in fact support the grounds of obviousness that were instituted.  Indeed, Apple's petitions provided detailed discussion of the CompuSonics Disclosures, including how each of the relied upon references taught how the CompuSonics telerecording process and DSPs could be used, and provided detailed claim charts explaining how each of the claim limitations was already found in the various disclosures.  (A00449-A00471; A00881-A00903.)  Apple also provided and cited an expert declaration from Dr. John Kelly, who testified about, *inter alia*, the level of ordinary skill in the art (A05257-A05258; A09478-A09479), the state of the art (A05260-A05272; A09482-A09494), each of the CompuSonics Disclosures and how they disclosed each and every limitation of the claims (A05272-A05282, A05298-A05309; A09494-A09503, A09519-A09534), and that it was his opinion that the claims

were both anticipated and "would have been in the possession of or obvious to one of ordinary skill in the art" (A05287; A09508).  The Board thus found, based on Apple's petitions (supported by Dr. Kelly's declarations), "that it is more likely than not that the CompuSonics publications teach collectively all of the limitations" of the challenged claims, and that the references were prior art printed publications that "all describe the same system developed by CompuSonics."  (A00570; A01002; *see also* A00026; A00093.)  Accordingly, "a person of ordinary skill in the art would have had reason to combine the disclosures," and "[c]ombining their disclosures would be the combination of prior art elements according to their established functions, within the skill of an ordinarily skilled artisan, and yielding predictable results."  (A00570-A00571 (citing *KSR*, 550 U.S. at 416-18); A01002 (same).)

SightSound argued to the Board that the Decisions on Institution were improper only under 37 C.F.R. § 42.208(c)—an argument the Board rejected because the "[p]etition[s] supported the ground of obviousness."  (A00025-A00027; A00092-A00094.)  To the extent SightSound now argues that the Decisions were improper under other regulatory or statutory sections (*see* Appellant's Br. at 35-40, 43-46), SightSound has waived any such argument.  *See, e.g.*, *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012) ("Absent exceptional circumstances, [this Court] generally do[es] not consider arguments that the applicant failed to

present to the Board." (internal citation omitted)).  But, even if SightSound had not

waived its newly-raised arguments, they have no merit and, at a minimum, there is

no clear and indisputable right to overturn the Board's Decisions on Institution.

SightSound argues, for example, that, despite the ample support for

obviousness found in Apple's petitions (which cited to, and were supported by, Dr.

Kelly's declarations), the Board was simply not allowed to consider such evidence

to conclude it was more likely than not that at least one claim was obvious.[13]

Specifically, SightSound asserts Apple "*never* identified a combination of

CompuSonics materials that collectively taught the invention of the SightSound

patents, and it *never* provided a reason to combine those materials." (Appellant's

Br. at 36.)  To the contrary, as the Board correctly found, Apple explained in the

petitions, including through citations to Dr. Kelly's supporting testimony, precisely

how the CompuSonics Disclosures collectively taught each and every limitation of

the challenged claims.  (*See* A00570-A00571; A01002-A01003; A00025-A00027;

A00092-A00094; *see also generally* A00449-A00471; A00881-A00903; A05272-

A05282, A05298-A05309; A09494-A09503, A09519-A09534.)   Such evidence

---

[13]     To the extent SightSound also argues that CBMRs should not have been
instituted on obviousness simply because Apple's petitions themselves (as opposed
to Dr. Kelly's declarations) did not explicitly state "in writing" the word "obvious"
with respect to the CompuSonics Disclosures, such an argument ignores the
explicit language of § 324(a) that authorizes institution of grounds based on "the
information presented in the petition" and would improperly exalt form over
substance.

that explains how the alleged invention was already known to those of ordinary skill in the art is pertinent to both anticipation *and* obviousness. *See, e.g.*, *In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002) ("It is well settled that 'anticipation is the epitome of obviousness.'" (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)); *Connell*, 722 F.2d at 1548 ("Though it is never necessary to so hold, a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness.'" (citation omitted)). And, as the Board also correctly found, the fact that each of the CompuSonics Disclosures explicitly explains how the CompuSonics telerecording process and DSPs could be used provides a motivation to combine the references by itself. *See, e.g.*, *Brown & Williamson*, 229 F.3d at 1125 (explaining that evidence of a motivation to combine "may flow from the prior art references themselves"). Accordingly, there is no basis to overturn the Board's institution on obviousness.

### C.     The Board Correctly Determined That The '573 Patent And The '440 Patent Are Eligible For CBMR

As to SightSound's complaint that its patents are not CBM patents, again, the Board's institution decisions are not reviewable and, in any event, there is no clear and indisputable right to overturn the Board's correct determination that the patents-in-suit are CBM patents. Rather than pointing to any right to the relief requested, SightSound relies on its *own interpretation* of the lone statement

Congress provided in the AIA concerning what a CBM patent is—"a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service." AIA § 18(d)(1). Specifically, SightSound argues this statement means that, to qualify as a CBM patent, "the invention as a whole must be directed to the management of money, banking, investment or credit." (Appellant's Br. at 28-30.) Again, the only question even possibly before the Court—assuming the Court entertains the possibility of mandamus—is whether SightSound has *a clear and indisputable right* to overturn the Board's determinations that the patents-in-suit are CBM patents. *See, e.g.*, *Cuozzo*, 778 F.3d at 1277-78. This burden is far from met here.

As the Board correctly found, the patents-in-suit cover "operations used in the practice, administration, or management of a financial product or service." (A00554-A00558; A00987-A00991); *see* AIA § 18(d)(1). For example, both patents concern "the electronic sales and distribution of digital audio or video signals" (A00294 col.1 ll.9-14; A00379 col.1 ll.16-20), and the claims of both patents concern the electronic exchange of money (A00296 at cl. 1 ("transferring money electronically"); A00403 at cl. 1 ("selling electronically")). Electronic sale of audio/video *is* a financial service, and there is no clear and indisputable right to a contrary determination.

SightSound's arguments demonstrate precisely why Congress determined that the decision to institute CBMR should not be reviewed. Under SightSound's argument, this Court would have to set aside the Board's obviousness determination, even though the claims are invalid, because, based on SightSound's newly-minted theory, the claims are insufficiently "financial" in nature. Although SightSound now takes the position that the claimed "second memory" is the "*sine qua non*" of the alleged invention, and is the "key component" of the claims, thus allegedly removing the claims from CBM purview (Appellant's Br. at 7, 30), that self-serving, conclusory assertion conveniently ignores the explicit financial limitations of the claims and disclosures in the specifications. Indeed, it is undermined entirely by the acknowledgement in the specifications that any such second memory (*e.g.*, the "user's Hard Disk") was "already commercially available." (A00295 col.4 ll.16-20; A00380 col.4 ll.33-37).

SightSound's suggestion on appeal that the alleged inventions make only a "fleeting reference to 'financial activity'" (*see* Appellant's Br. at 31-32), is unavailing in light of the claim limitations and repeated references in the specifications to how the alleged invention relates to "electronic sale." Indeed, during prosecution of the '573 Patent (which is a parent to the '440 Patent), the applicant repeatedly explained the financial nature of the alleged invention and the importance of financial features to the alleged invention. For example, the

applicant distinguished a reference by arguing that it failed to show "transferring money (or fee) to a first party at a location remote from the second memory and controlling use of the first memory from a second party financially distinct from the first party"—a limitation the applicant characterized as "***critical*** to the operation of the applicant's invention."  (A12332; A12381-A12384; A00436-A00438; A00858-A00859.)

SightSound also relegates to a single footnote any argument that the claims allegedly cover "technological inventions," which are excepted from CBMR proceedings (under AIA § 18(d) and 37 C.F.R. § 42.301).  That footnote provides only a conclusory statement that "[t]he patents are also not CBM patents because they recite novel and unobvious technological features: the patents recite a computer to transmit, and a second memory to store, digital signals in a way that prior art hardware units did not."  (Appellant's Br. at 35 n.9.)  This passing remark in a footnote regarding "technological inventions" waives this issue.  *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, No. 2014-1350, --- F.3d ----, 2015 WL 1319364, at *5 (Fed. Cir. Mar. 25, 2015) ("In any event, "[a]rguments raised only in footnotes . . . are waived." (quoting *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012))).  And, as already mentioned, this unsupported assertion is also contradicted by the specifications' explanation that any

-63-

conventional hardware that is "already commercially available" can be used for these components.  (A00295 col.4 ll.16-20; A00380 col.4 ll.33-37).

Accordingly, the challenged patents fall squarely within the scope of patents intended to be subject to CBMR proceedings.

The Board has not, contrary to SightSound's assertions, construed the statutory text as covering "any commerce-related invention," so as to "allow CBM review of any invention that employs a single element that is 'financial in nature' or makes a fleeting reference to 'financial activity.'"  (Appellant's Br. at 31-32, 34-35.)  The Board rejected precisely that argument, explaining that it "reviews petitions on their own facts to determine whether the challenged patent is a 'covered business method patent' under the AIA definition"—which, in this case is satisfied because of the claims' "expressly stated connection to financial activity" and the specification's "repeatedly [] disclosed method involv[ing] the electronic 'sale' of digital audio [and video] and the electronic 'transfer' of 'money.'" (A00557-A00558 (citing A00294 col.1 ll.9-14, col.2 ll.26-30, col.2 ll.51-58, A00295 col.3 ll.3-8, A00296 col.5 ll.33-35); A00990-A00991 (citing A00379 col.1 ll.16-21, col.2 ll.22-25, A00379-A00380 col.2 l.62-col.3 l.2, A00381 col.6 ll.20-48, A00382 col.7 ll.34-56).)  By contrast, the Board has routinely denied institution of petitions it deems do not challenge covered business method patents. *See, e.g.*, *Salesforce.com, Inc. v. Applications in Internet Time LLC*, No. CBM2014-00162,

2015 WL 470746, at *4-7 (P.T.A.B. Feb. 2, 2015) (finding no relation to the practice, administration, or management of a financial product or service); *Par Pharm., Inc. v. Jazz Pharms., Inc.*, Nos. CBM2014-00149, CBM2014-00150, CBM2014-00151, CBM 2014-00153, 2015 WL 216987, at *4-13 (P.T.A.B. Jan. 13, 2015) (same); *PNC Fin. Servs. Grp., Inc. v. Intellectual Ventures I LLC*, No. CBM2014-00032, 2014 WL 2174767, at *6-10 (P.T.A.B. May 22, 2014) (same); *see also, e.g.*, *Experian Mktg. Solutions, Inc. v. RPost Commc'ns Ltd.*, No. CBM2014-00010, 2014 WL 1628568, at *5-7 (P.T.A.B. Apr. 22, 2014) (finding technological invention); *Epsilon Data Mgmt., LLC v. RPost Commc'ns Ltd.*, No. CBM2014-00017, 2014 WL 1628569, at *5-7 (P.T.A.B. Apr. 22, 2014) (same).

The Board's analysis was fully consistent with the PTO's prior guidance and legislative history of the AIA.  In conducting its CBM analysis of the patents-in-suit, the Board noted that the PTO "considered the legislative intent and history behind the AIA's definition of 'covered business method patent,'" indicating that it "was drafted to encompass patents 'claiming activities that are financial in nature, incidental to a financial activity or complementary to a financial activity.'" (A00554 (quoting Definitions of Covered Business Method Patent and Technological Invention; Final Rule, 77 Fed. Reg. 48,734, 48,735-36 (Aug. 14, 2012) (citing 157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer))); A00987-A00988 (same).)  The Board also noted that the legislative

history behind the language suggests that "financial product or service" should be applied broadly.  (*See* A00554; A00988.)  Ultimately, however, the Board applied "the statutory language" as "control[ing] whether a patent is eligible for a covered business method review."  (A00556; A00989.)[14]  Nothing in that conscientious application of the statutory language approaches the standard for mandamus relief.

### D.    Alternative Ground For Affirmance: Claims 1, 2, 4, And 5 Of The '573 Patent And Claims 1, 64 And 95 Of The '440 Patent Were Anticipated By The CompuSonics Disclosures

To the extent this Court reaches this further issue—which is unnecessary since it should affirm the Board's obviousness determinations—this Court can affirm the invalidity of the challenged claims on the alternative instituted grounds of anticipation.  *See, e.g.*, *Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1355-56

---

[14]    Accordingly, SightSound's criticisms of the Board's citation to legislative history are misplaced.  (*See* Appellant's Br. at 32-33 & n.7.)  Moreover, though SightSound—while simultaneously claiming the legislative history is "irrelevant"—argues that other statements in the legislative history go against the statements the Board cited, they in no way contradict them.  *See, e.g.*, 157 Cong. Rec. S5441 (daily ed. Sept. 8, 2011) (statement of Sen. Leahy) ("A financial product or service is not, however, intended to be limited solely to the operation of banks.")  Rather, for the most part, they simply reiterate the point that AIA § 18 is not targeted at "technological innovations/inventions"—which are specifically excluded under the PTO's regulations, 37 C.F.R. § 42.301—such as novel and nonobvious software tools or money-sorting machines.  *See* 157 Cong. Rec. S5433 (daily ed. Sept. 8, 2011) (statements of Sen. Kirk, Sen. Durbin).  And, to the extent any of the statements attempted to limit AIA § 18 to patents used only by companies in the "financial services industry," *see* 157 Cong. Rec. H4497 (daily ed. June 23, 2011) (statement of Rep. Schuster), as the Board already explained, "the statutory language . . . controls" and such restrictive language is neither included within, nor suggested by, the text of AIA § 18.  (*See* A00556; A00989.)

(Fed. Cir. 2013) ("On judicial review, the correctness of the decision appealed from can be defended by the *appellee* on any ground that is supported by the record, whether or not the appellant raised the argument." (emphasis in original)); *In re Comiskey*, 554 F.3d 967, 973-75 (Fed. Cir. 2009) ("We have repeatedly applied *Chenery* and have said that '[w]e may, however, where appropriate, *affirm the [agency] on grounds other than those relied upon in rendering its decision, when upholding the [agency's] decision does not depend upon making a determination of fact* not previously made by the [agency].'" (citations omitted, emphases in original)).   Here, although the Board did not conclude that the challenged claims were anticipated by CompuSonics, the Board correctly found that each of the claimed methods is disclosed by the CompuSonics disclosures. The Board's decision invalidating all challenged claims on obviousness grounds can thus be affirmed on the alternative grounds of anticipation.

Under § 102(a), a patent claim can be anticipated if "the invention was known . . . by others in this country . . . before the invention thereof by the applicant for a patent."   Furthermore, this Court's precedent demonstrates that, to prove prior public knowledge of *the* invention, multiple sources of proof can be used.  *See, e.g.*, *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1369-70 (Fed. Cir. 2000).   Thus, the evidence showing the public knowledge of the invention need not be in the form of a single patent, publication, witness testimony,

physical product, etc. under this prong—whereas, on the other hand, if a party attempts to show, *e.g.*, that "the invention was . . . described in *a* printed publication in this or a foreign country" under § 102(a), anticipation *does* require a *single* document.

In *Ecolochem*, for example, multiple sources of information collectively disclosed that the claimed method was publicly known—thus anticipating it. Namely, public knowledge of the claimed method, which was a deoxygenation process for removing dissolved oxygen from a liquid, was shown with evidence of a public presentation of the invention, including (i) a slide displayed at a 1980 conference that showed a key "Figure 10," (ii) an oral discussion of the slide given by the prior inventor, Dr. Martinola, accompanying the displayed slide, and (iii) deposition testimony from Dr. Martinola confirming that "during his presentation at the 1980 conference he used Figure 10 of his diagram [sic] as a slide and discussed 'the use of a mixed bed ion exchange resin after hydrazine and activated carbon' for the same purposes and uses described in [the plaintiff's] patents." *See id.* at 1369. This Court affirmed the district court's anticipation ruling for claim 20 of one of the patents-in-suit, holding that "[a] presentation indicative of the state of knowledge and use in this country therefore qualifies as prior art for anticipation purposes under § 102," and explaining that "whether Dr. Martinola correctly remembered his presentation twelve years later [(at his deposition) was] an issue of

credibility, on which [this Court] review[s] the district court's finding with deference." *Id.* at 1369-70.

Similarly, though this Court ultimately found insufficient corroboration for successful anticipation on the facts presented, in *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1998), the evidence proffered in attempting to show public knowledge of the claimed method—which was a way of protecting foliage plants from freezing by establishing an insulating covering of ice over ground level watering—came from the testimony of four different witnesses: (i) the son of the alleged prior inventor (Mr. Hawkins), who testified he had worked on the system that employed the method as a child; (b) a long-time acquaintance, Mr. Burke, who testified he had used the same system as Mr. Hawkins; (c) an employee of Mr. Burke's, who testified he had observed the system; and (d) a life-long friend  who also testified he had observed Mr. Hawkin's system. *Id.* at 1369.  This Court considered these multiple sources of testimony as collective evidence of the alleged public knowledge of the claimed method under § 102(a), though ultimately held the testimony was insufficient to show anticipation by clear and convincing evidence because of the lack of corroboration of the testimony of biased witnesses—specifically, "the absence of any physical record to support the oral evidence." *Id.* at 1373.

Here, the methods claimed in the '573 and '440 Patents were already publicly known—there are no corroboration or evidentiary issues with the CompuSonics Disclosures that prove the publicly known invention. There can be no dispute that, under this Court's precedent, no physical prototype of the invention had to actually exist—indeed, in *Ecolochem*, for example, Dr. Martinola never implemented the invention he disclosed; rather, he only discussed it at a presentation. 227 F.3d at 1369-70. Thus, the fact that no telerecording *system* was ever physically constructed in the configuration of the publicly known invention, or that the CompuSonics Disclosures mention "a family of device models, as opposed to a single device model" for performing the steps of the claimed methods (A00023-A00024; A00090-A00091), has no legal bearing on this issue because a POSITA would have understood the disclosures taught *the* invention of each claim—a method. *Cf., e.g.*, *In re Antor Media Corp.*, 689 F.3d 1282, 1290 (Fed. Cir. 2012); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001). It is sufficient that the claimed method was known to the public.

The relevant features and possible implementations of the CompuSonics telerecording process and DSPs were documented and publicly disclosed through the CompuSonics Disclosures. Indeed, it was based on those disclosures that the Board instituted CBMR, finding that the challenged claims were more likely than

not anticipated by CompuSonics.  (A00566-A00570; A00999-A01001.)  And, in its Final Written Decisions, the Board acknowledged "that a person of ordinary skill in the art would have considered the [CompuSonics] publications *collectively* to achieve a system for selling music electronically, as expressly contemplated by the references." (A00042; A00109.)  That method, which the CompuSonics Disclosures taught could be performed using that system, is the invention that SightSound later attempted to claim as its own.

The publicly known capability to electronically sell and transmit audio and video signals (*i.e.*, CompuSonics' telerecording process) in the manner later claimed in SightSound's patents remained the same regardless of the particular DSP models used.   The DSP-1000 and DSP-2000 models were merely interchangeable hardware options, and thus "design choice[s]." (*See, e.g.*, A00793, A00795, A00808, A00812.)  The CompuSonics Disclosures themselves disclose the different possible configurations of the method, for example, transmission between DSP-2000 and DSP-1000 devices or between two DSP-2000 devices. (A12703; A05190; A05197.)  Each of these documents was published—a point SightSound has not challenged on appeal—which necessarily put their collective teachings in the public's knowledge.  (*See* A00029-A00031; A00096-A00098.) And each unequivocally references the existing CompuSonics technology in explaining it could be used to perform that invention.  Like the slides, oral

presentation, and deposition testimony of Dr. Martinola in *Ecolochem*, or the testimony of the four witnesses in *Woodland Trust*, the CompuSonics Disclosures collectively describe what was publicly known.  Accordingly, if this Court reaches this issue, the Court should hold that the CompuSonics Disclosures are properly collective evidence under § 102(a) of the public knowledge of the method later claimed in the '573 and '440 Patents.

Furthermore, and importantly, this Court need not engage in any new fact-finding to determine that the claims were anticipated.  As the Board correctly found (in the context of its obviousness analysis), evidence that each and every element of the challenged claims was publicly known is shown in the CompuSonics Disclosures.  (*See* A00031-A00037; A00054-A00059; A00098-A00104; A00121-A00126.)  On appeal, the only element that SightSound contends CompuSonics does not disclose is a "second memory" because, according to SightSound, "[t]he CompuSonics references never described or contemplated that a purchaser of digital audio or video signals would store the received digital signals in the 'second memory' of the claims—*i.e.*, non-removable media such as a hard disk." (Appellant's Br. at 61.)  But, as the Board noted, SightSound's argument is premised on its incorrect interpretation of "second memory," which the Board rejected as unsupported by the intrinsic evidence.  (A00032; A00099-A00100.) The floppy disk used by CompuSonics' DSP-1000 to store digital audio or video

signals meets the Board's proper interpretation of "second memory." (*Id.*) And even if SightSound were correct that "second memory" is limited to "non-removable media such as a hard disk," the CompuSonics system disclosed the use of both non-removable and hard disk memory as explained above. *See supra* Section II.B.  Indeed, the Board correctly found that the "CompuSonics publications teach that a hard disk can be used for storing digital video or digital audio signals," as claimed.  (A00122-A00123.)  These findings are supported by substantial evidence. *See supra* Section II.B.  Therefore, the disclosure of the claimed method in the CompuSonics Disclosures anticipated SightSound's challenged claims.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Apple respectfully requests that this Court affirm the determinations of the Patent Trial and Appeal Board that claims 1, 2, 4, and 5 of the '573 Patent and claims 1, 64, and 95 of the '440 Patent are unpatentable.

Respectfully submitted,

/s/ Douglas H. Hallward-Driemeier

Dated: April 13, 2015

Douglas H. Hallward-Driemeier
J. Steven Baughman
Paul M. Schoenhard
Megan F. Raymond
Sharon Lee

Darrell W. Stark
700 12th Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
Fax:  (202) 508-4650

James R. Batchelder
Lauren N. Robinson
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Telephone: (650) 617-4000
Fax:  (650) 617-4090

Ching-Lee Fukuda
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Fax:  (212) 596-9090

**ROPES & GRAY LLP**

*Counsel for Appellee Apple Inc.*

## CERTIFICATE OF SERVICE

On April 13, 2015, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Douglas H. Hallward-Driemeier
Douglas H. Hallward-Driemeier
*Counsel for Appellee Apple Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by this Court's January 5, 2015 Order, which ordered that Appellee's brief not exceed 16,500 words. The brief contains 16,254 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Douglas H. Hallward-Driemeier
Douglas H. Hallward-Driemeier
*Counsel for Appellee Apple Inc.*